Case No. 22-30564

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

Randy Boudreaux,

Plaintiff – Appellant

v.

Louisiana State Bar Association, a Louisiana Nonprofit Corporation; Louisiana Supreme Court; Bernette J. Johnson, Chief Justice of the Louisiana Supreme Court; Scott J. Crichton, Associate Justice of the Louisiana Supreme Court for the Second District; James T. Genovese, Associate Justice of the Louisiana Supreme Court for the Third District; Marcus R. Clark, Associate Justice of the Louisiana Supreme Court for the Fourth District; Jefferson D. Hughes, III, Associate Justice of the Louisiana Supreme Court for the Fifth District; John L. Weimer, Associate Justice of the Louisiana Supreme Court for the Sixth District; Unidentified Party, successor to the Honorable Greg Guidry as Associate Justice of the Louisiana Supreme Court for the First District,

Defendants – Appellees

Appeal from the United States District Court for the Eastern District of Louisiana
Case No. 2:19-cv-11962, Hon. Lance M. Africk, presiding

# APPELLANT'S OPENING BRIEF

Scott Day Freeman
Timothy Sandefur
**Scharf-Norton Center for Constitutional Litigation at the GOLDWATER INSTITUTE**
500 E. Coronado Rd.
Phoenix, AZ 85004
(602) 462-5000
litigation@goldwaterinstitute.org

Sarah Harbison
**Pelican Center for Justice**
**PELICAN INSTITUTE FOR PUBLIC POLICY**
400 Poydras St., Ste. 900
New Orleans, LA 70130
(504) 500-0506
sarah@plalaw.com

Dane S. Ciolino
**DANE S. CIOLINO, LLC**
18 Farnham Place
Metairie, LA 70005
(504) 975-3263
dane@daneciolino.com

*Attorneys for Plaintiff-Appellant*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case.  These representations are made so that the judges of this court can evaluate possible disqualification or recusal.

| | |
|---|---|
| **Plaintiff-Appellant:** | **Counsel for Plaintiff-Appellant:** |
| Randy J. Boudreaux | Scott Day Freeman |
| | Timothy Sandefur |
| | GOLDWATER INSTITUTE |
| | |
| | Sarah Harbison |
| | PELICAN INSTITUTE FOR PUBLIC POLICY |
| | |
| | Dane S. Ciolino |
| | **DANE S. CIOLINO, LLC** |
| | |
| **Defendants-Appellees:** | **Counsel for Defendants-Appellees:** |
| Louisiana State Bar Association | Richard C. Stanley |
| Justices of the Louisiana Supreme Court | Eva J. Dossier |
|     Chief Justice John L. Weiner | Kathryn W. Munson |
|     Associate Justice William J. Crain | STANLEY, REUTER, ROSS, |
|     Associate Justice Scott J. Crichton | THORNTON & ALFORD, LLC |
|     Associate Justice James T. Genovese | |
|     Associate Justice Jay B. McCallum | |
|     Associate Justice Jefferson D. Hughes III | |
|     Associate Justice Piper D. Griffin | |

**Other Persons:**
All attorneys compelled to join the
Louisiana State Bar Association

/s/ *Scott Day Freeman*
Attorney of Record for
Plaintiff-Appellant Randy Boudreaux

## STATEMENT REGARDING ORAL ARGUMENT

This appeal involves novel issues concerning the violation of First Amendment rights of attorneys forced to join "mandatory" state bar associations. Although this appeal presents a mandatory bar challenge similar to the challenge brought in *McDonald v. Longley*, 4 F.4th 229 (5th Cir. 2021), the issues on appeal address questions not addressed in *Keller v. State Bar of California*, 496 U.S. 1 (1990), or *McDonald*. These issues concern the application of law to undisputed facts where the district court deemed the bar's pre-*McDonald* legislative activities moot, thereby escaping an analysis of the germaneness of those activities, and where the bar's post-*McDonald* social media and other communications were deemed germane and not a "major activity" of the bar.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..................................................... i

STATEMENT REGARDING ORAL ARGUMENT ........................................... iii

TABLE OF CONTENTS ....................................................................... iv

TABLE OF AUTHORITIES ............................................................... vi

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF ISSUES ................................................................. 1

STATEMENT OF THE CASE................................................................ 2

    I.     "Integrated" or "Mandatory" State Bar Associations ........................... 2

    II.    Louisiana's Mandatory Bar .................................................... 4

    III.   The LSBA's Conduct Has Included Public Policy Pronouncements, Legislative Activity, and General Trade Activity That is Nongermane. 5

    IV.   The Bar's Post-*McDonald* Changes and Conduct ................................. 9

    V.    The Bar's Inadequate "Opt-In" Procedure ........................................... 11

    VI.   Proceedings Below ............................................................. 12

SUMMARY OF THE ARGUMENT .................................................... 15

ARGUMENT ....................................................................................... 17

I.  Standard of Review ....................................................................... 17

II.  The District Court Erred in Concluding that Challenges Related to the Bar's Past and Possible Future Legislative Activities Are Moot. ........................... 18

III. A Bar Association that Engages in Nongermane Activities Violates Members' First Amendment Rights—Irrespective of Whether the Conduct Constitute a "Major Activity" of the Bar. ............................................................................ 22

    A. Per this Court's decision in *McDonald* an Exacting Scrutiny Analysis Applies. ................................................................................................ 23

    B. The "Germaneness" Analysis Requires the Application of Exacting Scrutiny. .............................................................................................. 25

    C. This Court Should Reverse the District Court Because the LSBA Engages in Nongermane Activities. ..................................................................... 27

    D. No "Major Activity" Standard Governs Whether the Bar's Volitional Constitutional Violations Are Excused. ............................................... 28

        1. The Challenged Messages Are Nongermane. ................................. 28

        2. Nongermane Activity Violates First Amendment Constitutional Rights. ...................................................................................... 30

IV. The Bar's *Hudson* Procedures Are Insufficient Because the Bar Does Not Provide Members Meaningful Advance Notice of Objectionable Activities. 32

V. This Court Should Vacate the District Court's Judgment and Afford the Relief Appellant Seeks. ................................................................................. 34

CONCLUSION ............................................................................................. 35

CERTIFICATE OF SERVICE ....................................................................... 37

CERTIFICATE OF COMPLIANCE .............................................................. 38

# TABLE OF AUTHORITIES

**Cases**

*Abood v. Detroit Board of Education*, 431 U.S. 209 (1977) ...................................32

*Bd. of Trs. New Orleans Emp'rs Int'l Longshoremen's Ass'n v. Gabriel, Roeder, Smith & Co.*, 529 F.3d 506 (5th Cir. 2008) .........................................................17

*Boudreaux v. La. State Bar Ass'n*, 3 F.4th 748 (5th Cir. 2021)........................ 14, 32

*Boudreaux v. La. State Bar Ass'n*, 433 F. Supp.3d 942 (E.D. La. 2020) ................14

*Boy Scouts of Am. v. Dale,* 530 U.S. 640 (2000)......................................................23

*Chafin v. Chafin*, 568 U.S. 165 (2013) ....................................................................19

*Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986) ............................. passim

*Christian Legal Soc'y v. Walker*, 453 F.3d 853 (7th Cir. 2006)..............................35

*Connell v. Shoemaker*, 555 F.2d 483 (5th Cir. 1977) ..............................................19

*Crowe v. Oregon State Bar*, 989 F.3d 714 (9th Cir. 2021).....................................31

*Elrod v. Burns*, 427 U.S. 347 (1976) .......................................................................34

*Harris v Quinn,* 573 U.S. 616 (2014) ......................................................................24

*In re Fisher*, 24 So.3d 191 (La. 2009) .......................................................................4

*In re Mundy*, 11 So.2d 398 (La. 1942).......................................................................4

*In re Petition for a Rule Change to Create a Voluntary State Bar*, 841 N.W.2d 167 (Neb. 2013) ............................................................................................................3

*In re Smith*, 17 So.3d 927 (La. 2009).........................................................................4

*Janus v. AFSCME*, 138 S. Ct. 2448 (2018) ......................................... 15, 23, 29, 32

*Jarchow v. State Bar of Wisc.*, 140 S. Ct. 1720 (2020) .............................................2

*Keller v. State Bar of California*, 496 U.S. 1 (1990) ....................................... passim

*Knox v. SEIU*, 567 U.S. 298 (2012) ................................................ 11, 15, 21, 23, 25

*Lathrop v. Donohue*, 367 U.S. 820 (1961) ........................................ 13, 14, 30, 31

*Lewis v. Ascension Parish Sch. Bd.*, 806 F.3d 344 (5th Cir. 2015) ........................17

*McCullen v. Coakley*, 573 U.S. 464 (2014) .............................................................23

*McCutcheon v. FEC*, 572 U.S. 185 (2014) ...............................................................23

*McDonald v. Longley*, 4 F.4th 229 (5th Cir. 2021) ........................................ passim

*Owsley v. San Antonio Indep. Sch. Dist.*, 187 F.3d 521 (5th Cir. 1999) ................18

*Roberts v. U.S. Jaycees*, 468 U.S. 609 623 (1984) ..................................................15

*Shaw Constructors v. ICF Kaiser Engineers, Inc.*, 395 F.3d 533 (5th Cir. 2004)..18

*Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535 (5th Cir. 2013) .......35

*United States v. Washington*, 142 S. Ct. 1976 (2022) ............................................19

*Vela v. City of Houston,* 276 F.3d 659 (5th Cir. 2001) ...........................................18

*Washington Post v. McManus*, 355 F. Supp.3d 272 (D. Md. 2019).......................23

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022)........................................................19

*Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015) .............................................23

**Statutes**

28 U.S.C. § 1291 .........................................................................................................1

28 U.S.C. § 1331 .........................................................................................................1

28 U.S.C. § 1343 .........................................................................................................1

LA R.S. § 37:211 .........................................................................................................4

LA R.S. § 37:213 .........................................................................................................4

**Rules**

Fed. R. Civ. P. 12(b)(1) .................................................................. 13, 14

Fed. R. Civ. P. 12(b)(6) ........................................................................13

La. R. Prof. Cond. 1.1(c) ........................................................................4

La. Sup. Ct. R. XIX ...........................................................................4, 5

La. S. Ct. R. XIX, § 8(C) .........................................................................4

La. S. Ct. R. XVII § 1 .............................................................................5

La. S. Ct. R. XVIII § 6 ................................................................... passim

Other Authorities

*A Bill for Establishing Religious Freedom*, *in* 2 Papers of Thomas Jefferson (J. Boyd ed. 1950) ..............................................................................29

Leslie C. Levin, *The End of Mandatory State Bars?*, 109 Geo. L. J. Online 1 (2020) ....................................................................................26

Marilyn Cavicchia, *Newly Formed California Lawyers Association Excited to Step Forward*, ABA Journal (Apr. 30, 2018) .................................................3

Ralph H. Brock, "*An Aliquot Portion of Their Dues:" A Survey of Unified Bar Compliance with Hudson and Keller*, 1 Tex. Tech J. Tex. Admin. L. 23 (2000) ..3

*The Integrated Bar Ass'n*, 30 Fordham L. Rev. 477 (1962) ......................................2

## JURISDICTIONAL STATEMENT

The district court had jurisdiction because Appellant alleges violations of the First and Fourteenth Amendments.  28 U.S.C. §§ 1331, 1343.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because this appeal arises from a final judgment in favor of Appellees.  The district court entered final judgment on August 8, 2022, and Appellant filed a timely notice of appeal on September 1, 2022 (ROA.1074–1075).

## STATEMENT OF ISSUES

This case presents several important questions left open by the Supreme Court in *Keller v. State Bar of California*, 496 U.S. 1 (1990), and this Court's recent decision in *McDonald v. Longley*, 4 F.4th 229 (5th Cir. 2021).

1. Whether the district court erred by disregarding the bar's pre-*McDonald* legislative activity, deeming it moot, thereby avoiding any analysis as to whether Appellant's constitutional rights were violated?

2. Whether the bar engaged in nongermane activity through its pre-*McDonald* legislative activity and ongoing communications with its members, even if those nongermane activities do not constitute a "major activity" of the bar association?

3. Whether a mandatory state bar association fails to provide adequate notice of its activities to members, notice sufficient to allow members to

decide whether to "opt-in" to having their dues fund those activities,

when the bar relies upon "inquiry notice" to cure otherwise vague and

inadequate descriptions of those activities?

## STATEMENT OF THE CASE

## I.     "Integrated" or "Mandatory" State Bar Associations

"Integrated" or "mandatory" state bar associations are entities constituting

"official state organization[s] requiring membership and financial support of all

attorneys admitted to practice in th[e] jurisdiction." *The Integrated Bar Ass'n*, 30

Fordham L. Rev. 477, 477 (1962).  These mandatory organizations engage in a

host of activities, including regulating and disciplining lawyers; lobbying the

legislature; promoting "access to justice," pro bono work, and diversity; addressing

lawyer "wellness" issues; organizing conferences and continuing legal education

programs, holding public forums, publishing reports, and promoting charitable

activities.  *See id.*  Other states, Louisiana included, have other, separately funded

organizations carry out certain of these functions.

Mandatory bar associations are unlike voluntary bar associations because the

state makes membership in them compulsory "'as a condition of practicing law in a

State.'"  *McDonald*, 4 F.4th at 231 (quoting *Keller*, 496 U.S. at 5); *see also*

*Jarchow v. State Bar of Wisc.*, 140 S. Ct. 1720, 1720 (2020) (Thomas, J. dissenting

from denial of cert.) ("Unlike voluntary bar associations, integrated or mandatory

bars require attorneys to join a state bar and pay compulsory dues as a condition of practicing law in the State.").

Mandatory bar associations can, and do, burden the First Amendment rights of their members. *McDonald*, 4 F.4th at 245; *see also Keller*, 496 U.S. at 12 (stating that mandatory bar associations can burden First Amendment rights in a way analogous to "agency-shop" arrangements burdening rights of union members). Although many states continue to have mandatory bar associations, others do not, without any harmful consequences to the practice of law or the public. Indeed, states such as New York, Illinois, Massachusetts, Ohio, and Pennsylvania regulate lawyers directly without requiring membership in a mandatory bar association. *See In re Petition for a Rule Change to Create a Voluntary State Bar*, 841 N.W.2d 167, 171 (Neb. 2013).[1]

---

[1] *See* Ralph H. Brock, "*An Aliquot Portion of Their Dues:*" *A Survey of Unified Bar Compliance with Hudson and Keller*, 1 Tex. Tech J. Tex. Admin. L. 23, 24 n.1 (2000). This article identifies thirty-two states with a mandatory bar association. Since its publication, however, California has adopted a bifurcated system under which lawyers pay only for purely regulatory activities and are not forced to fund the bar association's political or ideological speech, eliminating most if not all the First Amendment problems. *See* Marilyn Cavicchia, *Newly Formed California Lawyers Association Excited to Step Forward*, ABA Journal (Apr. 30, 2018), *available at* https://bit.ly/2LEYNg0. Nebraska also adopted a bifurcated system in 2013 but then made its bar association fully voluntary. *See In re Petition for a Rule Change to Create a Voluntary State Bar of Neb.*, 841 N.W.2d at 173; Neb. S. Ct. Rule 3-100(B) (amended effective February 12, 2020, to require payment of an annual assessment to the Nebraska Supreme Court rather than the Nebraska State Bar Association).

## II.   Louisiana's Mandatory Bar

All attorneys licensed in Louisiana are required to be members of the
Louisiana State Bar Association ("LSBA") and pay its annual membership dues.
LA R.S. §§ 37:211, 37:213; La. S. Ct. R. XIX, § 8(C); La. R. Prof. Cond. 1.1(c);
*see also In re Mundy*, 11 So.2d 398 (La. 1942).  The Louisiana Supreme Court,
through its Justices, has the exclusive authority to discipline and disbar any
licensed lawyer who fails to pay the LSBA dues.  *See In re Fisher*, 24 So.3d 191
(La. 2009); *In re Smith*, 17 So.3d 927 (La. 2009).

According to Article III, § 1, of its Articles of Incorporation, the LSBA's
purpose is "to regulate the practice of law, advance the science of jurisprudence,
promote the administration of justice, uphold the honor of the Courts and of the
profession of law, encourage cordial intercourse among its members, and,
generally, to promote the welfare of the profession in the State."  ROA.1418; *see*
*also* La. S. Ct. R. XVIII § 6 (ROA.1436).  Rather than engaging in conduct that
directly relates to the regulation of lawyers as "officers of the court" however, the
LSBA liberally construes its purpose to include acting as an interest group or trade
association, not as a body administering the ethics and discipline of lawyers.

But the LSBA is not the entity responsible for attorney discipline in
Louisiana.  *See* La. Sup. Ct. R. XIX; ROA.1043.  The formal system of
professional ethical regulation is handled exclusively by the Louisiana Attorney

4

Disciplinary Board ("LADB"), which serves as the "statewide agency to administer the lawyer discipline and disability system." *See* ROA.2067 § 2(A). All attorneys licensed in Louisiana must pay an annual "assessment" to the LADB—separate from and in addition to their LSBA member dues. La. S. Ct. R. XIX; ROA.2071 § 8(A). The LSBA also does not handle the admission or licensing of new attorneys, which the Louisiana Supreme Court oversees through its Bar Admissions Committee. La. S. Ct. R. XVII § 1; ROA.1043.

## III. The LSBA's Conduct Has Included Public Policy Pronouncements, Legislative Activity, and General Trade Activity That is Nongermane.

The LSBA has engaged in nongermane political and ideological speech—including advocacy on substantive legislation and issues of policy that have nothing to do with regulating the lawyers or improving the quality of legal services. In this respect, and others, the LSBA acts as a trade association for lawyers, engaging in all the typical behaviors of such associations, including private, voluntary bar associations.

Before January 22, 2022, the LSBA conducted legislative advocacy through a "Legislation Committee." *Compare* ROA.1462 (LSBA By-Laws art. X, § 1(5) (2022) (showing that the LSBA's prior Legislation Standing Committee has been "[r]eplaced with Supreme Court Rule XVIII, Section 6" as of January 22, 2022)) *with* ROA.1476–77 (prior provision of the By-Laws).

Article XI, § 2, of the pre-2022 version of the LSBA's Bylaws expresses the LSBA's desire to influence public policy through legislative advocacy. Its criteria for "legislative positions" include "[l]ikelihood of success within the legislative process" and whether the LSBA's issue lobbying will have "an impact on actions of decision-makers." ROA.1477–78 § 2(d) & (i). The current incarnation of this By-Law provision simply vests the decision making on legislation with the Board of Governors, ostensibly limiting its discretion to matters within the ambit of the newly "clarified" Louisiana Supreme Court Rule XVIII § 6. *Id.*

Before 2022, the LSBA's Legislation Committee evaluated bills in part through "Policy Positions" adopted by the LSBA's House of Delegates. *See* ROA.1804–09 (Louisiana State Bar Association, LSBA HOD Policy Positions (January 2021)). These policy positions have included— among others—a resolution "[u]rging the adoption of laws prohibiting discrimination in employment, housing and accommodations for LGBT persons" and a resolution "strongly supporting a requirement for a full credit of civics in the high school curriculum in the State of Louisiana, while eliminating the free enterprise requirement and incorporating those concepts into the civics curriculum." ROA.1808–09.

Since 2007, the LSBA took positions on more than 407 nongermane bills. The LSBA has

- Opposed bills to (1) limit civil liability for persons using automated external defibrillators (ROA.1699), (2) provide civil immunity for volunteers working with the state or its political subdivisions regarding homeland security (*id.*), (3) limit civil liability of health care providers during a declared emergency (ROA.1700), (4) regulate oyster leases (ROA.1718), and (5) regulate midwifery licensing (ROA.1727) and to provide for administration of auto-injectable epinephrine by a school nurse (ROA.1729)—all based on a "[g]eneral [LSBA] policy against expansion of immunities."

- Opposed a bill regarding rehabilitation of injured employees. ROA.1707.

- Opposed a bill to limit the liability of landowners to grant a right of passage to cemeteries (ROA.1757) and a bill for the return of certain "RSD" schools to the transferring school board, because they contained immunity provisions (ROA.1763).

- Opposed bills that would respectively (1) provide for the carrying of concealed handguns on school property by certain teachers or administrators (ROA.1774), (2) authorize electronic delivery of insurance coverage notices (ROA.1775), and (3) address bullying (ROA.1783).

- Supported a bill to prohibit elementary and secondary schools that receive state funds from discriminating based on gender identity or sexual orientation.  ROA.1782.

- Supported a bill that would "[p]rovide[] for out-of-state automobile insurance coverage" for the purpose of "protect[ing] Louisiana citizens and accident victims from out-of-state drivers utilizing Louisiana roads."  ROA.1781.

- Opposed the Omnibus Premium Reduction Act of 2020.  ROA.1792.

- Opposed a bill to reduce the jury threshold amount.  ROA.1874.

- Opposed a bill to change the "collateral source rule."  ROA.1794.

- Opposed a bill regarding the reduction of insurance rates.  ROA.1795.

- Opposed a bill to "[e]stablish[ ] the licensed profession of art therapist." ROA.1795.

- Opposed a bill to regulate peer-to-peer car sharing.  ROA.1796.

- Opposed a bill regarding the regulation of funeral directors and embalmers.  ROA.1797.

- Opposed a bill "relative to the practice of medicine" that would adopt the Interstate Medical Licensing Compact.   ROA.1802.

- Opposed a bill to create a "retired volunteer dental hygienist license." ROA.1875–76.

The LSBA has consistently maintained that positions it took on legislation before 2022 have been "germane." The LSBA also maintains that recent changes to Supreme Court Rule XVIII § 6 and its By-Laws have not changed its practices or the scope of its authority, only "clarified" them. ROA.535–36; ROA.1045–46; ROA.1244-45.

In addition, to legislative activities, the LSBA engages in other conduct characteristic of a trade association. This conduct often takes the form of publishing information to its members tantamount to public service announcements, including nongermane communications related to eating right, getting good sleep, "wellness," "happiness," addressing student debt, computer equipment, checking smoke detector batteries, and promoting charitable or religious events. ROA.1047–48.

## IV. The Bar's Post-*McDonald* Changes and Conduct

This Court issued its opinion in *McDonald v. Longley*, 4 F.4th 229 (5th Cir. 2021), on July 2, 2021. On July 8, 2021, the LSBA's Board of Governors suspended its legislative committee and all legislative activities until the LSBA's House of Delegates could meet in January 2022. ROA.1045. In the interim, the Louisiana Supreme Court adopted its Rule XVIII § 6, which the district court found to "codif[y] the constitutional germaneness standard and shift[]

responsibility for legislative policy and positions from the Legislative Committee and House of Delegates respectively to the Board of Governors." *Id.*

At its meeting in January 2022, the LSBA's House of Delegates approved the following measures:

1.   Repealing the LSBA's prior legislative policy positions;

2.   Changing the LSBA's Bylaws to "to more accurately reflect current operating practices and remove outdated and obsolete provisions that are no longer effective";

3.   Recognizing the Louisiana Supreme Court's new Rule XVIII § 6 and suspending "any [LSBA] activity not within [the Rule's] scope, including but not limited to any action with respect to legislative policy provisions previously adopted by the House of Delegates (which provisions are now obsolete and no longer effective under the text of the Rules)." ROA.1046.

Since this Court's opinion in *McDonald*, the LSBA has not engaged in legislative activity, even though its updated Bylaws reserve that right to the LSBA's Board of Governors. ROA.1457–58.

Given the LSBA's discontinuation of its prior legislative practices, change in Bylaws, and the Louisiana Supreme Court's adoption of Rule XVIII § 6, the

district court regarded Appellant's objections to the LSBA's legislative activities

as moot.  ROA.1051–52, 1054.

## V.    The Bar's Inadequate "Opt-In" Procedure

Where mandatory bar associations engage in nongermane activities,

Supreme Court precedent requires them to maintain procedures that allow

members to not fund, through their compulsory dues, nongermane activities to

which they object.  S*ee Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986)

(describing "opt-out" procedures).  Indeed, recent precedent requires procedures by

which members must "opt-in" before members' dues are used to subsidize

objectionable, nongermane activities.  *See Knox v. SEIU*, 567 U.S. 298, 321–22

(2012).

Although the LSBA used "opt-out" *Hudson* procedure in the past, it has

recently implemented an "opt-in" approach.  ROA.1069.  The bar does this by

providing members with a prospective budget and provides the email address of

the LSBA's treasurer if a member requires additional information about the

budget.  *Id*.; ROA.2525-30.  The district court took issue with the bar's vague

descriptions of some categories of expenses, but it nevertheless was satisfied that

that the descriptions were sufficient when coupled with its invitation for members

to inquire with the bar's Treasurer about those expenses.  ROA.1071.  Thus, the

district court placed the burden of identifying objectionable expenses on the members themselves rather than the bar.  *Id.*

## VI.    Proceedings Below

Appellant Randy Boudreaux is a licensed Louisiana lawyer who wants to be free to decide for himself what organizations he associates with and how he spends his discretionary income.  He does not want to be compelled to be a member of, and associate with, the LSBA to practice law in Louisiana.  ROA.20 ¶ 11, ROA.23 ¶¶ 26–27, ROA.28–29 ¶¶ 57–62.

On August 1, 2019, Appellant sued the LSBA and members of the Louisiana Supreme Court (Appellees here), bringing the following claims:

1.    Mandatory membership in the LSBA alone violates Appellant's First and Fourteenth Amendment rights, irrespective of bar conduct.  But Appellant's First Amendment rights are particularly violated because the LSBA engages in nongermane conduct not strictly required to regulate lawyers.  ROA.30–32 ¶¶ 70–80.

2.    Compelling Appellant to pay annual dues to the LSBA violates his First and Fourteenth Amendment rights because the payment of those dues cannot be separated from the organization that uses them, including when it engages in

conduct not strictly required to uphold any compelling interest the state might have in regulating lawyers. ROA.32–34 ¶¶ 81– 95.

3.     To the extent compelled bar dues are constitutional, Appellant's First and Fourteenth Amendment rights are violated because the LSBA does not provide Appellant with adequate notice of its activities such that Appellant can know how his dues fund LSBA-conduct not strictly related to the regulation of lawyers. ROA.34–36 ¶¶ 96–106.

Appellant seeks declaratory and injunctive relief—seeking to have Louisiana's current mandatory bar scheme declared unconstitutional and enjoining enforcement of the current mandatory bar scheme. ROA.37.

After Appellant filed his complaint, Appellees moved to dismiss pursuant to Rules 12(b)(1) and 12(b)(6). ROA.100–01, ROA.137–38. The district court dismissed Appellant's challenge to mandatory LSBA membership under Rule 12(b)(6), concluding that the claim was foreclosed by the Supreme Court's decisions in *Lathrop v. Donohue*, 367 U.S. 820 (1961), and *Keller,* 496 U.S. 1. ROA.382–85. The district court also dismissed Appellant's challenge under Rule 12(b)(1), concluding that the Tax Injunction Act bars it. ROA.340–48. The district court dismissed Appellant's challenge to the adequacy of the LSBA's

safeguards, Appellant's third claim, also pursuant to Rule 12(b)(1), concluding that Appellant lacked standing.  *See Boudreaux v. La. State Bar Ass'n*, 433 F. Supp.3d 942 (E.D. La. 2020).

On appeal, this Court reversed.  *See Boudreaux v. La. State Bar Ass'n*, 3 F.4th 748 (5th Cir. 2021).  In so doing, this Court held that neither *Lathrop* nor *Keller* foreclosed Appellant's forced membership claim, that the Tax Injunction Act did not bar Appellant's mandatory dues claim, and that Appellant had standing to pursue his claim related to the adequacy of the LSBA's safeguards.  This Court issued its mandate to the district court on July 26, 2021.  ROA.401.

After remand, and on the heels of this Court's decision in *McDonald*, Appellant promptly moved for preliminary injunction on July 26, 2021. ROA.424–25.  The district court heard the motion for preliminary injunction as part of a trial on the merits, which was conducted on June 21, 2022.  ROA.1012– 13.

On August 8, 2022, the district court filed its Findings of Fact and Conclusions of Law.  ROA.1040–72.  That same day, the district court entered a final judgment dismissing Appellant's claims with prejudice.  ROA.1073. Appellant timely filed his Notice of Appeal on September 1, 2022.  ROA.1074–75.

## SUMMARY OF THE ARGUMENT

When bar associations act, "membership is part of the message."

*McDonald*, 4 F.4th at 245. "If a member disagrees with that 'conception of the

good life or controversial ideology,' then compelling his or her membership

infringes on the freedom of association. *Id.* (citing *Janus v. AFSCME*, 138 S. Ct.

2448, 2463 (2018)).

Appellant objects to being a compelled member of the LSBA. His objection

is grounded upon his right of freedom of association. It is not dependent upon his

agreement or disagreement with bar policy or conduct or whether the conduct is

germane or nongermane to the state's interest in regulating lawyers. The bar's

nongermane conduct, however, illustrates that mandatory state bar associations,

like Louisiana's, do not confine themselves to behavior strictly related to any

proven compelling state interest in regulating lawyers *qua* lawyers or the lawyer's

role in improving the quality of legal services. *See McDonald*, 4 F.4th at 247–48.

As this Court has stated, "[c]ompelled membership in a bar association that

engages in non-germane activities … fails exacting scrutiny." *Id.* at 246 (citing

*Knox,* 567 U.S. at 310 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609 623 (1984)).

Appellant's claims are similar to those brought against the Texas bar in

*McDonald*: Appellant's rights under the First and Fourteenth Amendments are

violated by (1) compelled membership in the bar, (2) compelled dues paying to a

15

state bar association that engages in nongermane conduct, and (3) inadequate safeguards in place for Appellant to object to paying dues for nongermane conduct.

As in *McDonald*, Appellant identifies examples of the bar's legislative activity and communications that are nongermane. Here, however, the district court did not assess whether the bar's legislative activities were germane. Satisfied that the bar would no longer engage in legislative activity, the district court deemed that "issue" moot, even though the bar is not foreclosed from engaging in those activities, which the bar contended had been germane, in the future, and even though the germaneness of the bar's past legislative activities is relevant to Appellant's compelled dues claim *and* Appellant's forced membership claim.

As for other ongoing conduct of the bar related to its social media and other communications, the district court deemed all such communications germane, even regarding communications reminding members of checking batteries in smoke detectors as related to "regulating lawyers" and "improving the quality of legal services." In the alternative, the district court also wrongly concluded that these communications, even if nongermane, do not rise to the level of a constitutional injury because they are not a "major activity" of the bar. ROA.1060–64.

As in *McDonald*, no meaningful dispute exists as to the underlying facts at issue. The bar's past legislative activity is highly probative of Appellant's constitutional injuries, not only in having to subsidize those activities, but being

forever associated with them as a compelled member of the bar. In addition, this Court can and should deem the communications Appellant challenges as nongermane and not excused by a "major activity" threshold, which is not supported by any controlling legal authority, including this Court's decision in *McDonald*, 4 F.4th at 249 ("*[S]ome* of the legislative program is non-germane, so compelling the plaintiffs to join an association engaging in it violates their freedom of association" (emphasis added)).

Finally, this Court also should reverse the district court's determination that the bar's practice of *Hudson* procedures are constitutionally adequate. The district court found some of the bar's budget line-items to be inadequate but cured by the bar affording its members inquiry notice of its activities, thereby wrongly placing the burden on members to ferret out which activities and expenditures are constitutionally impermissible so they can object to subsidizing them.

## ARGUMENT

## I.    Standard of Review

"'The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo.'" *Lewis v. Ascension Parish Sch. Bd.*, 806 F.3d 344, 353 (5th Cir. 2015) (quoting *Bd. of Trs. New Orleans Emp'rs Int'l Longshoremen's Ass'n v. Gabriel, Roeder, Smith & Co.*, 529 F.3d 506, 509 (5th Cir. 2008)). "'A finding is clearly erroneous if it is without

substantial evidence to support it, the court misinterpreted the effect of the evidence, or this court is convinced that the findings are against the preponderance of credible testimony.'" *Id.*

Here, no meaningful disagreement exists as to the facts, and the district court did not identify any in its Findings of Fact and Conclusions of Law. The parties disagree as to the law and its application to these facts. Because there are no disputes of material fact, only the legal consequences from those facts, this Court can and should vacate the judgment entered against Appellant, render a preliminary injunction prohibiting enforcement of Louisiana's mandatory bar scheme against Appellant, and remand for further proceedings consistent with this Court's decision. *Cf.* S*haw Constructors v. ICF Kaiser Engineers, Inc.*, 395 F.3d 533, 539 n.9 (5th Cir. 2004) (reversing and directing judgment be entered on liability); *Vela v. C*i*ty of Houston,* 276 F.3d 659, 671 (5th Cir. 2001) (reversing ruling on cross motions for summary judgment and directing judgment be entered for non-prevailing party below); O*wsley v. San Antonio Indep. Sch. Dist.*, 187 F.3d 521, 527 (5th Cir. 1999) (reversing and rendering judgment for adverse party on cross-motions for summary judgment).

## II.     The District Court Erred in Concluding that Challenges Related to the Bar's Past and Possible Future Legislative Activities Are Moot.

The district court concluded that Appellant had raised justiciable issues with respect to his first claim related to compelled membership and his third claim

18

related to inadequate safeguards.  ROA.1054.  As to Appellant's second claim

related to compelled payment of dues, however, the district court ruled that claim

was moot insofar as to claims arising from pre-*McDonald* legislative conduct of

the bar.  *Id.*  But the district court was incorrect because the bar's pre-*McDonald*

legislative conduct is probative of ongoing and, potentially recurring, constitutional

violations.

     As the Supreme Court has stated, "as long as the parties have a concrete

interest, however small, in the outcome of the litigation, the case is not moot."

*Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation omitted).  The burden of

overcoming a claim of mootness is a high one.  *West Virginia v. EPA*, 142 S. Ct.

2587, 2607 (2022).  Furthermore, a case cannot be moot "unless it is impossible for

[a court] to grant any effectual relief."  *United States v. Washington*, 142 S. Ct.

1976, 1983 (2022) (citation omitted); *see also Connell v. Shoemaker*, 555 F.2d

483, 486 (5th Cir. 1977) (finding claim for declaratory relief is not moot if the facts

alleged under all the circumstances "'show that there is a substantial controversy []

between parties having adverse legal interests.'" (citation omitted)).

     Here, the district court should not have avoided evaluating the germaneness

of the LSBA's legislative conduct for the following reasons:

     First, any professed intention by the bar to live within the confines of this

Court's decision in *McDonald* is irrelevant.  Appellees have consistently

maintained that all bar conduct has been germane. Although Appellees might argue that *McDonald* added "clarity" to the state of the law, any promise to abide by *McDonald* in the future is belied by the bar's past, capacious interpretation of germaneness. The bar's past legislative conduct is probative of its propensity, now through its Board of Governors, to engage in future nongermane legislative activities.

Second, the bar's actions do not suggest that it will cease its nongermane activities. Again, Appellees maintain that all the bar's activities have been, and are, "germane," and they have not renounced that view even though the LSBA's past legislative conduct is plainly contrary to *McDonald*. ROA.526. Indeed, neither the bar nor the district court in its ruling identified a single form of advocacy in which it previously engaged that the bar will now cease because of this Court's decision in *McDonald* or the Louisiana Supreme Court's new Rule XVIII § 6.

Third, the bar's past legislative conduct, and Appellant's forced subsidy of that conduct, informs Appellant's broader freedom of association claim, which is not entirely dependent upon a compulsion to pay dues or even a germaneness analysis. Cessation of nongermane legislative activity does not cure the associational injury to Appellant. Accordingly, the district court should have analyzed that activity under the guidance of this Court's decision in *McDonald*.

20

Fourth, a defendant's voluntary cessation of unconstitutional conduct does not moot a constitutional claim; otherwise, defendants could always temporarily cease unconstitutional conduct to defeat a lawsuit challenging it. *Knox*, 567 U.S. at 307 (stating that the "voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed.") Although the district court found that the LSBA "repealed" past positions on legislation and public policy matters, the LSBA has not renounced or permanently prevented itself from taking positions on legislation or public policy matters in the future, applying its expansive view of germaneness.

Moreover, as further evidence of the bar's expansive view of "germaneness," the LSBA continues to engage in nongermane speech post *McDonald* and post amendment to Supreme Court Rule XVIII § 6. For example, the LSBA's Bar Governance Committee issued several public policy pronouncements *after* the recent amendment to Supreme Court Rule XVIII § 6 including on issues such as taxation of legal services, support of initiatives to assist low-income individuals with "access to justice," compensation of the judiciary, unauthorized practice of law, and diversity. ROA.807 n.5. Although the LSBA portrays these policy provisions as germane, reasonable people may disagree as to how each is approached and elected representatives can, and often do, weigh in on

21

them.  Also, although the LSBA's committee opposes taxation of legal services, it

is not unreasonable to support a broad-based and evenly-applied tax system, where

professional services are taxed.  ROA.1095 at lns. 4–10; ROA.1124 at ln. 19–

ROA.1128 at ln. 16.

Accordingly, although the bar attempted to clean the slate with respect to

past legislative activity, it has set the stage for future conduct through policy

pronouncements and future lobbying its Board of Governors might direct.  The

district court, therefore, should have confronted the bar's past legislative activities

and determined whether it has engaged in nongermane conduct that has injured

Appellant, not only by having compelled Appellant to subsidize those activities but

also by now forcing him to be associated with them.

## III.   A Bar Association that Engages in Nongermane Activities Violates Members' First Amendment Rights—Irrespective of Whether the Conduct Constitute a "Major Activity" of the Bar.

Putting aside the bar's pre-*McDonald* legislative activity, which the district

court sidestepped by deeming them moot, the district court wrongly concluded that

other challenged conduct of the bar was either germane or, alternatively, not a

"major activity" of the bar and therefore permissible even if nongermane.

ROA.1062–63.  But the district court was wrong, not only about its determination

as to the germaneness of the conduct itself, but also as to a so-called "major

activity" standard.

### A.     Per this Court's decision in *McDonald* an Exacting Scrutiny Analysis Applies.

First Amendment rights are implicated *whenever* speech or association is compelled or subsidized. *Janus v. AFSCME*, 138 S. Ct. 2448, 2464 (2018) ("When speech is compelled … individuals are coerced into betraying their convictions. Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning."); *Boy Scouts of Am. v. Dale,* 530 U.S. 640, 648 (2000).

The requirement that Appellant associate with and subsidize the LSBA represents a substantial invasion of his rights and should be permitted only where it serves "a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms." *Janus,* 138 S. Ct. at 2465 (quoting *Knox*, 567 U.S. at 310). The Supreme Court characterizes the scrutiny that should be applied as "exacting scrutiny" at a minimum, while other times the Court describes this analysis as "strict scrutiny" or "the most exacting scrutiny." *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 478 (2014).

Irrespective of label, the Appellees bore the burden to demonstrate that their mandatory bar scheme is narrowly focused to serve a compelling state interest, using the least restrictive means available. *Accord Williams-Yulee v. Florida Bar*, 575 U.S. 433, 442 (2015); *McCutcheon v. FEC*, 572 U.S. 185, 197 (2014); *Washington Post v. McManus*, 355 F. Supp.3d 272, 289 n.14 (D. Md. 2019). Not only did the Appellees not do this, but the district court entered no such

conclusions indicating that Appellees had met their burden.  The absence of such findings and conclusions means the district court's findings and conclusions do not, and cannot, serve as a basis for the entry of judgment against Appellant.

Applying the required strict/exacting scrutiny means that Appellant should have prevailed below.  *See McDonald*, 4 F.4th at 246 ("Compelled membership in a bar association that engages in non-germane activities … fails exacting scrutiny.")  Any interest Appellees might have in regulating lawyers beyond the ethical/disciplinary function that the Supreme Court recognized in *Harris v Quinn* as compelling can be served in other, less restrictive ways.  *See* 573 U.S. 616, 655 (2014) (stating that *Keller* permitted mandatory bar dues "for activities connected with proposing ethical codes and disciplining bar members").  Given that the LSBA *does not* have an ethical/disciplinary regulatory role, the LSBA pursues other areas, most of which have the hallmarks of a trade association or are the typical domain of private bar associations, with which the LSBA unfairly competes.  *See, e.g.*, Colorado Bar Ass'n Quick Facts & Tip Sheet[2] (voluntary state bar association); Bylaws of the N.Y. State Bar Ass'n[3] (same).  Appellant should not be compelled to be associated with LSBA or to pay dues to it.

---

[2] https://www.cobar.org/About-the-CBA#8982230-r-recruit--retain-members
[3] https://nysba.org/app/uploads/2022/02/Bylaws-January-2022.pdf

**B.    The "Germaneness" Analysis Requires the Application of Exacting Scrutiny.**

Even if the moribund and vague "germaneness" analysis to determine whether compelled membership in the LSBA violates Appellant's First Amendment rights, Appellant still prevails under *McDonald* because the LSBA engages in conduct not germane to regulating lawyers *qua* lawyers.

In *McDonald*, this Court held that a state violates an attorney's First Amendment rights when it forces that attorney to join a bar association that engages in activities that are not germane to regulating the legal profession or improving the quality of legal services.  Specifically, *McDonald* states that "compelling a lawyer to join a bar association engaged in non-germane activities burdens his or her First Amendment right to freedom of association."  4 F.4th at 245.  *McDonald* further holds that a law that compels attorneys to join a bar association is subject to "exacting" First Amendment scrutiny, which requires the government to show that the mandatory association serves a "'compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Id.* at 246 (quoting *Knox*, 567 U.S. at 310).  This Court concluded in *McDonald* by stating that *"[c]ompelled membership in a bar association that engages in non-germane activities … fails exacting scrutiny."* *Id.* (emphasis added).  Although states may have a general interest in allocating expenses related to regulating the legal profession and improving the quality of

legal services, "they do not have a *compelling interest in having all licensed attorneys engage as a group in other, non-germane activities*." *Id.* (emphasis added).

This Court further concluded in *McDonald* that mandatory membership in such a bar association fails exacting scrutiny for the additional reason that the state could achieve its legitimate interests by means significantly less restrictive of First Amendment rights, as proven by many other states that regulate the legal profession without forcing lawyers to join a bar association. *Id.*; *see also* Leslie C. Levin, *The End of Mandatory State Bars?*, 109 Geo. L. J. Online 1, 18–19 (2020) (no evidence that compulsory bar associations are better than voluntary bars at improving legal services).

This Court also found that the mandatory bar in Texas failed exacting scrutiny because the Texas Bar engaged in nongermane activities, such as supporting some legislative proposals that "relate to substantive Texas law and are wholly disconnected from the Texas court system or the law governing lawyers' activities." *McDonald*, 4 F.4th at 248. Examples included past "lobbying to amend the Texas Constitution's definition of marriage and create civil unions," and for changes to Texas's trust law, to the extent that those changes do not "affect lawyers' duties when serving as trustees." *Id.* The Fifth Circuit found it *irrelevant* that the Texas Bar also engaged in germane activities; "[w]hat is important" for

First Amendment purposes "is that some of the legislative program is non-germane." *Id.* Because "some of the legislative program is non-germane, … compelling the plaintiffs to join an association engaging in it violate[d] their freedom of association." *Id.* at 249.

### C.    This Court Should Reverse the District Court Because the LSBA Engages in Nongermane Activities.

Mandatory LSBA membership is unconstitutional for many of the same reasons that *McDonald* held mandatory Texas Bar membership to be unconstitutional. The LSBA, like the Texas Bar, has supported and opposed legislative proposals that "relate to substantive [state] law and are wholly disconnected from the [state] court system or the law governing lawyers' activities." *Id.* at 248.

For example, the LSBA's opposition in 2020 to the establishment of the licensed profession of art therapist, and to the creation of a retired volunteer dental hygienist license, has no conceivable relationship to the regulation of the legal profession or improving the quality of legal services. ROA.1794–95. Neither does the LSBA's support, in 2018, for a bill to prohibit schools that receive state funding from discriminating based on gender identity or sexual orientation. ROA.1782; *see also McDonald*, 4 F.4th at 248 ("[T]he Bar's lobbying to amend the Texas Constitution's definition of marriage and create civil unions is obviously non-germane.").

The district court avoided examining any of this conduct because it deemed the entirety of it as moot.  But as explained above, it erred in so doing:  The past legislative activity evidences the bar association's broad interpretation of germaneness, with a Board of Governors fully empowered to act on that interpretation.  It also evidences a constitutional injury not limited to a right not to subsidize nongermane conduct, but to Appellant's broad First Amendment right of freedom of association.

### D. No "Major Activity" Standard Governs Whether the Bar's Volitional Constitutional Violations Are Excused.

In addition to its propensity to take positions on pending legislation, the LSBA also engages in other expressive conduct equally pernicious in the context of First Amendment rights.  These include past and current public policy pronouncements, endorsement of charities and religious observances, nanny-state-like pronouncements on "wellness," etc.  ROA.1047–48.  These messages to its members are not germane—and they are not excused by a newly minted "major activity" threshold.

### 1.   The Challenged Messages Are Nongermane.

In particular, the district court evaluated fifteen tweets and emails the LSBA issued in 2021 along with the LSBA providing notice to its members of the 69th Annual Red Mass hosted by the St. Thomas Moore Catholic Lawyers Association and a tweet and an email notifying members of their opportunity to participate in

28

Halloween and Christmas charity drives. *Id.* The district court found them all germane.

The district court's rationale in finding that these bar communications are germane has no limiting principle. For example, the district court found that notifying members of charity drives or the St. Thomas Moore Red Mass improves "the image of the legal profession" and "creates [camaraderie]." ROA.1062–63). The Founders thought otherwise, as they were especially concerned with preventing government from forcing people to associate with religious groups and their speech. When Thomas Jefferson wrote that "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhor[s] is sinful and tyrannical"—a statement prominently quoted in *Janus*, 138 S. Ct. at 2464—he was referring specifically to *religious* opinions. *A Bill for Establishing Religious Freedom*, *in* 2 Papers of Thomas Jefferson 545 (J. Boyd ed. 1950).

In another example, the district court reasoned that a bar communication urging attorneys to test and change batteries in smoke and carbon monoxide detectors was germane because "it encourages lawyers to maintain safe law offices, which served to protect clients, law office employees, and client records." ROA.1064. The threads of this germaneness rationale are truly gossamer. *Id.* (acknowledging that "[t]he germaneness of this tweet is more tenuous.")

None of these bar communications concern regulating lawyers *qua* lawyers, and none of them seek to improve the quality of legal services through the unique role lawyers play in providing those services. These communications, or ones like them, could be broadcast by any organization or corporation to its members or employees. Lawyers do not have a special or unique need to be reminded to check batteries in smoke detectors, to eat right and get good sleep, to have the latest computer gadgets, or to participate in charitable activities—all of which is offered by the challenged communications. ROA.1819–20; ROA.1843–1940. That makes the communications nongermane. The potential worthiness of some of the messages is irrelevant. As this Court in *McDonald* made clear: controversy is *not* the test for germaneness, and, though they "may be salutary," bar association "activities aimed at aiding the needy" are *not* germane unless they pertain to regulating the legal profession or improving the quality of legal services. 4 F.4th at 250–51. Forcing Appellant to associate with the LSBA and its messages violates his right to freedom of association.

### 2.    Nongermane Activity Violates First Amendment Constitutional Rights.

Perhaps recognizing the slender reed upon which its germaneness determination relied, and referencing dicta from *Lathrop*, 367 U.S. 820, the district court found alternatively that the bar's communications did not rise to a

constitutional violation because the communications did not amount to a "major activity" of the bar. ROA.1063–64. No such "major activity" threshold exists.

*Lathrop*, while using the term "major activity," did not establish any such standard. Rather, "*Lathrop* held that lawyers may constitutionally be mandated to join a bar association that solely regulates the legal profession and improves the quality of legal services. *McDonald*, 4 F.4th at 244; *Crowe v. Oregon State Bar*, 989 F.3d 714, 728 (9th Cir. 2021) (finding that *Lathrop* "merely permitted states to compel practicing lawyers to pay toward the costs of regulating their profession"). *Lathrop* did not address the broad freedom of association claim at issue in this case. *McDonald*, 4 F.4th at 244.

To the extent this Court addressed the "quantum" of nongermane activities in *McDonald*, it explained that "[w]hat is important" for purposes of a freedom-of-association claim "is that *some* of the [Bar's] legislative program is non-germane." 4 F.4th at 248 (emphasis in original).

"Some" in this context can mean "one instance" or an unspecified number. It does not mean "major activity" or "majority activity," terms this Court could have used but did not, and for good reason. Requiring a plaintiff to prove that the violations of his or her constitutional rights exceeded some quantitative or qualitative threshold of bar activity would create an unreasonable, if not impossible, standard for a plaintiff to meet. Furthermore, the bar could easily

manipulate that standard, claiming that its main purpose is to pursue a particular set of activities, leaving it free to violate members' rights with impunity through "non-major activities."[4]

## IV. The Bar's *Hudson* Procedures Are Insufficient Because the Bar Does Not Provide Members Meaningful Advance Notice of Objectionable Activities.

The district court also erred in finding that the bar's procedures for allowing its members to "opt-out" of subsidizing nongermane bar activities were sufficient.

This Court stated that a plaintiff's "inability to identify non-germane expenses is itself a constitutional injury, entitling the plaintiff to relief." *See McDonald*, 4 F.4th at 253 n.41 (citing *Boudreaux v. La. State Bar Ass'n*, 3 F.4th 748 (5th Cir. 2021)). Acknowledging *Keller*'s "increasingly wobbly, moth-eaten foundations," *id.* at 253, this Court nevertheless analyzed the "dues-deduction opt-out" framework that *Keller* employed, which in turn was based on *Hudson*, 475 U.S. 292, and the now-overturned *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977). *See Janus*, 138 S. Ct. at 2486 (condemning as a vague and ungovernable process).

---

[4] In ruling on Appellant's third claim related to the bar's inadequate *Hudson* procedures, the district court states that a "bar association that complies with *McDonald*'s freedom of association holding will necessarily classify all of its activities as germane." ROA.1067. But the bar need not do that if *McDonald* actually established the "major activity" standard—which it does not— that the district court used when evaluating the challenged bar tweets and other communications.

As the district court noted, the LSBA recently implemented an "opt-in" procedure, wherein the bar gives members prospective budgets of its activities so that members can decide whether to object to having a portion of their upcoming bar dues used to subsidize activities the members believe is nongermane.  *See* ROA.1069; ROA.2525–30.  The district court found that the bar's budget was granular but that "some" budget items were not "self-explanatory."  ROA.1070 (noting the budget line item for "LIFT Program" as an example).

Despite acknowledging that some of the bar's budget line items were inadequate, the district court found that the bar's procedures complied with *Hudson*, in part because the bar invited members to contact the bar's treasurer by email with questions about the budget or to review the bar's website about the bar's activities.  ROA.1071.  But "inquiry notice" is not the standard.  This Court stated that *Hudson* requires the bar to provide "an adequate explanation of the basis for the fee …"  *McDonald*, 4 F.4th at 253.  The burden is on *the bar* to provide this information to its members, not on its members to do the research.

"Inquiry notice" was precisely one of the problems this Court identified with the Texas bar's *Hudson* procedures in *McDonald*.  This Court faulted the Texas bar because the notice the bar provided its members "places the onus on objecting attorneys to parse the Bar's proposed budget—which only details expenses at the line-item level, often without significant explanation—to determine which

33

activities might be objectionable." *Id.* at 254.  Under the district court's rationale here, however, the Texas bar could have cured all its notice problems if it had simply included the email address of its treasurer when publishing its budget, inviting members to contact him or her if they had questions about the budget line-items.

Allowing state bars to satisfy the *Hudson* procedures by inviting members to inquire or conduct their own research regarding the bar's activities and expenditures would significantly weaken the protections *Hudson* was describing. Given the development of First Amendment law in the mandatory bar and public-sector union contexts since *Hudson*, protections should be strengthened, not weakened.

## V.     This Court Should Vacate the District Court's Judgment and Afford the Relief Appellant Seeks.

In *McDonald*, this Court not only partially reversed the district court's denial of summary judgment in favor of the plaintiffs, but also reversed the district court's denial of the plaintiffs' motion for preliminary injunction.  *McDonald*, 4 F.4th at 255.  It did so in part because it concluded that the plaintiffs had "succeeded on the merits already." *Id.*  In so doing, this Court stated, that "[t]he loss of First Amendment freedoms, for even minimal periods of time unquestionably constitutes irreparable injury." *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)).

The results here should be no different than in *McDonald* because Appellant has identified LSBA conduct that is nongermane, which means that the LSBA's conduct fails exacting scrutiny and Appellant's rights have been violated. Without an injunction, Appellant will suffer irreparable harm. "[I]injunctions protecting First Amendment freedoms are always in the public interest.'" *Id*. (quoting *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013)). Finally, "the balance of equities weighs heavily in [Appellant's] favor because the only harm to the Bar is the inability to extract mandatory dues from [him] in violation of the First Amendment, which is really 'no harm at all.'" *Id*. (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006)).

## CONCLUSION

The district court's Findings of Fact and Conclusions of Law do not support the judgment entered against Appellant. Nor do they support a denial of Appellant's motion for preliminary injunction. This Court should vacate the district court's judgment against Appellant, render a preliminary injunction preventing the enforcement of Louisiana's rules requiring Appellant to join and pay dues to the LSBA, and remand to the district court for further proceedings necessary to render other relief Appellant requested.

**RESPECTFULLY SUBMITTED** this 22nd day of November 2022 by:

/s/  *Scott Day Freeman*

Scott Day Freeman
Timothy Sandefur
**Scharf-Norton Center for**
**Constitutional Litigation**
**at the GOLDWATER INSTITUTE**

Sarah Harbison
**Pelican Center for Justice at the**
**PELICAN INSTITUTE FOR PUBLIC**
**POLICY**

Dane S. Ciolino
**DANE S. CIOLINO, LLC**

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of November 2022, the foregoing brief

was filed and served on all counsel of record via the ECF system.


/s/ *Scott Day Freeman*
**Scharf-Norton Center for**
**Constitutional Litigation**
**at the GOLDWATER INSTITUTE**

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and 5th Cir. R. 32.3, I certify that this

Brief:

(a)    was prepared using 14-point Times New Roman font;

(b)    is proportionately spaced; and

(c)    contains 7,594 words.

Submitted this 22nd day of November 2022,

/s/ *Scott Day Freeman*

Scott Day Freeman
**Scharf-Norton Center for
Constitutional Litigation
at the GOLDWATER INSTITUTE**