No. 22-30564

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

RANDY BOUDREAUX,

*Plaintiff – Appellant*

v.

LOUISIANA STATE BAR ASSOCIATION, a Louisiana Nonprofit Corporation; LOUISIANA SUPREME COURT; BERNETTE J. JOHNSON, Chief Justice of the Louisiana Supreme Court; SCOTT J. CRICHTON, Associate Justice of the Louisiana Supreme Court for the Second District; JAMES T. GENOVESE, Associate Justice of the Louisiana Supreme Court for the Third District; MARCUS R. CLARK, Associate Justice of the Louisiana Supreme Court for the Fourth District; JEFFERSON D. HUGHES, III, Associate Justice of the Louisiana Supreme Court for the Fifth District; JOHN L. WEIMER, Associate Justice of the Louisiana Supreme Court for the Sixth District; UNIDENTIFIED PARTY, successor to the Honorable Greg Guidry as Associate Justice of the Louisiana Supreme Court for the First District,

*Defendants – Appellees*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA, NO. 2:19-CV-11962, HONORABLE LANCE M. AFRICK, PRESIDING

---

## BRIEF OF DEFENDANTS-APPELLEES THE LOUISIANA STATE BAR ASSOCIATION AND JUSTICES OF THE LOUISIANA SUPREME COURT

---

Richard C. Stanley
Eva J. Dossier
Kathryn W. Munson
STANLEY, REUTER, THORNTON,
 ALFORD, L.L.C.
909 Poydras Street, Ste. 2500
New Orleans, LA 70112
Telephone: (504) 523-1580
*Counsel for Defendants-Appellees*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellee: | Counsel for Appellee: |
|---|---|
| Louisiana State Bar Association<br>Louisiana Supreme Court<br>Justices of the Louisiana Supreme Court<br>Chief Justice John L. Weimer<br>Associate Justice William J. Crain<br>Associate Justice Scott J. Crichton<br>Associate Justice James T. Genovese<br>Associate Justice Jay B. McCallum<br>Associate Justice Jefferson D. Hughes III<br>Associate Justice Piper D. Griffin | Richard C. Stanley<br>Eva J. Dossier<br>Kathryn W. Munson<br>STANLEY, REUTER, THORNTON, ALFORD, L.L.C. |
| **Appellant:** | **Counsel for Appellant:** |
| Randy J. Boudreaux | Timothy Sandefur<br>Scott Day Freeman<br>GOLDWATER INSTITUTE |
| | Sarah Harbison<br>James Stuart Baehr<br>PELICAN INSTITUTE FOR PUBLIC POLICY |
| | Dane S. Ciolino<br>DANE S. CIOLINO, LLC |

*/s/ Richard C. Stanley*
*Counsel of Record for Appellees*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

The Plaintiff-Appellant has requested oral argument. The Defendants-Appellees do not believe oral argument is necessary. The district court's decision to dismiss the Plaintiff's claims was correctly decided based on factual determinations that were not clearly erroneous and should not be upset on appeal. In the event this Court grants the Appellant's request for oral argument, the Appellees request the opportunity also to present argument.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ....................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................. ii

TABLE OF CONTENTS.................................................................................... iii

TABLE OF AUTHORITIES ..............................................................................v

Other Authorities........................................................................................... vii

STATEMENT OF THE ISSUES........................................................................1

STATEMENT OF THE CASE ...........................................................................1

SUMMARY OF THE ARGUMENT ..................................................................6

STANDARD OF REVIEW ................................................................................7

ARGUMENT ....................................................................................................8

    I.     Introduction. .........................................................................................8

    II.    Background .........................................................................................10

         A.    The LSBA works with the Louisiana Supreme Court to regulate the practice of law and improve the quality of legal services. .........................................................................10

         B.    Other LSBA activities independently regulate the practice of law and improve the quality of legal services. .....................13

         C.    The LSBA's post-*McDonald* changes ensure constitutional compliance. .......................................................13

    III.    The district court correctly determined that *McDonald* forecloses Mr. Boudreaux's reliance on *Janus*. ...................................................15

    IV.    The legislative challenges are moot; alternatively, they are untimely and the Plaintiff did not show the requisite injury..............18

A.    The District Court correctly concluded the legislative challenges are moot......................................................18

B.    In the alternative, the District Court should be affirmed because the legislative challenges are untimely and have not resulted in a cognizable injury. ...........................................21

V.    The district court correctly held that the LSBA's post-*McDonald* conduct is germane. ...............................................................23

A.    Lawyer wellness is germane. ....................................23

B.    Notices of lawyer-centric activities and volunteer opportunities are germane...........................................24

C.    Technological competency and public safety announcements are germane. ....................................26

D.    Alternatively, any non-germane activity was *de minimis*, did not materially impair any constitutional rights, and did not meet *Lathrop*'s major activity threshold requirement. .......27

VI.    The LSBA's *Hudson* safeguards are sufficient, as evidenced by Plaintiff's failure to identify any expenditure for which he lacked adequate notice. ...................................................................30

VII.    In the alternative, the government speech doctrine applies. ...............34

CONCLUSION ..........................................................................37

CERTIFICATE OF SERVICE ................................................39

CERTIFICATE OF COMPLIANCE ......................................40

iv

# <u>TABLE OF AUTHORITIES</u>

CASES

*Abood v. Detroit Board of Education*,
   431 U.S. 209 (1977)…………………………………………………...34

*Already, LLC v. Nike, Inc.*,
   568 U.S. 85 (2013)…………………………………………………….18

*Anderson v. City of Bessemer City*,
   470 U.S. 565 (1985)…………………………………………………...19

*Barto v. Shore Constr., LLC*,
   801 F.3d 465 (5th Cir. 2015)…………………………………………8

*Boudreaux v. Louisiana State Bar Ass'n*,
   3 F.4th 748, 751 (5th Cir. 2021). …………………………………*passim*

*Chicago Teachers Union, Local No. 1, AFT, AFL-CIO v. Hudson*,
   475 U.S. 292 (1986)………………………………………………*passim*

*Crowe v. Oregon State Bar*,
   989 F.3d 714 (9th Cir. 2021)……………………………………..6, 27

*Estate of Lisle v. Comm'r*,
   541 F.3d 595 (5th Cir. 2008)………………………………………..19

*Gordon v. James*,
   No. CV 16-16540, 2017 WL 4311125 (E.D. La. Sept. 26, 2017)…………...21

*Helton v. Clements*,
   832 F.2d 332 (5th Cir. 1987)………………………………………..21

*Janus v. AFSCME*,
   138 S. Ct. 2448 (2018)……………………………………………*passim*

*Keller v. State Bar of California*,
   496 U.S. 1 (1990)…………………………………………………*passim*

*Knox v. Serv. Emps. Int'l Union, Loc. 1000,*
    567 U.S. 298 (2012)……………………………………………………...17

*Lathrop v. Donahue,*
    367 U.S. 820 (1961)……………………………………………………*passim*

*Luwisch v. American Marine Corp.,*
    856 F.3d 320 (5th Cir. 2020)……………………………………………..7, 19

*McDonald v. Longley,*
    4 F.4th 229 (5th Cir. 2021)…………………………………………….*passim*

*Pleasant Grove City, Utah v. Summum,*
    555 U.S. 460 (2009)……………………………………………………35, 36

*Princeton Univ. v. Schmid,*
    455 U.S. 100 (1982)…………………………………………………..21

*Schell v. Chief Justs. & Justs. of Oklahoma Supreme Court,*
    11 F.4th 1178 (10th Cir. 2021)………………………………………21, 29

*United States v. United Foods, Inc.,*
    533 U.S. 405 (2001)……………………………………………………...22

## STATUTES

42 U.S.C. § 1983…………………………………………………………..21

## RULES

Fed. R. Civ. Proc. 12…………………………………………………………..3

Fed. R. Civ. Proc. 12(b)(6)………………………………………………22, 30, 31

Fed. R. Civ. Proc. 52(a)(6)……………………………………………….....8

La. R. Prof. Cond. 1.1…………………………………………………...26

La. R. Prof. Cond. 1.6…………………………………………………...26

La. R. Prof. Cond. 1.16…………………………………………………...24, 26

La. R. Prof. Cond. 7.7…………………………………………………………10

La. S. Ct. Rule XVIII, §6…………………………………………………..*passim*

## **Other Authorities**

La. Code of Professionalism……………………..………………………..*passim*

Stuart White, *Trade Unionism in a Liberal State*, in Freedom of Ass'n
(Amy Guttman ed. 1998)………………………………………………………17

## **STATEMENT OF THE ISSUES**

1.  Whether the district court correctly determined that the Plaintiff's challenges to pre-*McDonald* legislative activity are moot because the Legislation Committee no longer exists, the challenged legislative policies have been rescinded, structural changes ensure that the challenged conduct will not recur, and credible testimony from multiple witnesses confirmed the LSBA's commitment to the post-*McDonald* changes.

2. Whether the district court correctly determined that the post-*McDonald* conduct relative to lawyer wellness and technological competence is germane to regulating the profession and improving the quality of legal services, and, in the alternative, that *McDonald* does not require the extinction of an integrated bar upon a single instance of non-germane speech.

3. Whether the district court correctly determined that the LSBA's *Hudson* procedures are adequate when the Plaintiff did not identify any instance in which he was unable to challenge an allegedly non-germane expenditure because of inadequate notice.

## **STATEMENT OF THE CASE**

The LSBA is an "integrated" or "mandatory" bar association, meaning that Louisiana law compels every attorney licensed in Louisiana to be a member of the

1

LSBA to practice law in the state.[1] Louisiana law also authorizes the LSBA to charge annual membership fees to its mandatory members. Those dues are currently $80 for lawyers admitted three years or less and $200 for members admitted more than three years.[2] Although membership in the bar and payment of dues are mandatory for Louisiana attorneys, the LSBA does not compel participation in any of its activities. ROA.1041 (District Court). In this regard, membership in the bar is a term of art that designates a person as admitted to practice law in Louisiana, but does not imply personal association with LSBA policies or positions.[3] The LSBA posts disclaimers on its website, in the *Bar Journal*, in its CLE marketing materials, and in its annual registration and dues documents to make clear that it does not speak on behalf of all of its members.[4]

The LSBA's five elected officers serve without compensation, its affairs are administered by a Board of Governors representing different geographic districts,

---

[1] ROA.1961, Exh. 2 (La. R.S. § 37:211); *Boudreaux v. Louisiana State Bar Ass'n*, 3 F.4th 748, 751-52 (5th Cir. 2021).

[2] ROA.1982, Exh. 5 (By-Laws of the LSBA).

[3] ROA.1168, Testimony of Randy Boudreaux ("Boudreaux") (agreeing "that no one has ever told [him] they believed [he was] personally associated with anything they saw in the LSBA website" and that he "do[es] not conclude that every lawyer in Louisiana agrees" with a position on the LSBA's website).

[4] ROA.1168 (Boudreaux) (acknowledging that he is "aware that in these publications, the LSBA also includes disclaimers that the . . . positions taken by the LSBA do not necessarily reflect the position of its members"); ROA.1221, Testimony of Kelly Ponder ("Ponder") (stating that "after *McDonald*," the LSBA "redoubled [its] efforts to make sure the disclaimers were visible").

and its policy-making body is the House of Delegates, which includes delegates from each judicial district.[5]

Any LSBA member who objects to the use of the LSBA's mandatory dues for a cause (whether legislative or otherwise) that he or she considers non-germane may file an objection.[6] Once an objection is filed, the pro rata amount of the objecting member's dues devoted to the challenged activity is placed promptly in escrow while the Board of Governors reviews the member's objection.[7] Within 60 days, the Board of Governors will either authorize a pro rata refund to the objecting member or refer the objection to arbitration.[8] Historically, all timely objections have resulted in refunds.[9]

Randy Boudreaux, a licensed Louisiana attorney and member of the LSBA, filed this lawsuit against the LSBA and the justices of the Louisiana Supreme Court on August 1, 2019, challenging mandatory membership in the LSBA, mandatory payment of dues to the LSBA, and the adequacy of the LSBA's procedural safeguards.[10] The district court initially dismissed the lawsuit pursuant to Rule 12, but this Court reversed and remanded. The Court emphasized that it was not pre-

---

[5] ROA.1041 (District Court); ROA.1231-1232, Testimony of Robert Kutcher ("Kutcher").

[6] ROA.1044 (District Court).

[7] ROA.1044, 1068 (District Court).

[8] ROA.1045, 1068-69 (District Court).

[9] ROA.1044, 1069 (District Court).

[10] ROA.18-19.

deciding the merits, observing: "Discovery may bear out that LSBA does not actually engage in any non-germane activity."[11] The same day, this Court issued its opinion in *McDonald v. Longley*, 4 F.4th 229 (5th Cir. 2021), which provides a roadmap for constitutional compliance.

On July 8, 2021, less than one week after this Court decided *McDonald*, the LSBA Board of Governors voted to suspend the then-existing Legislation Committee of the LSBA and all legislative activities until the House of Delegates convened for its January 2022 meeting.[12]

The Louisiana Supreme Court also adopted Rule XVIII, § 6, which codifies the constitutional germaneness standard and shifts responsibility for legislative policy and positions from the Legislation Committee and House of Delegates respectively to the Board of Governors.[13] Accordingly, the House of Delegates (and the Legislation Committee) are no longer responsible for the LSBA's legislative policy positions and advocacy, if any. Instead, the Board of Governors is the sole LSBA entity that can perform such functions, and its activities are limited to constitutionally germane topics such as those identified as appropriate in *McDonald*. ROA.1964, Exh. 3 (Rules of Supreme Court of Louisiana, Rule XVIII) (limiting in both procedure and substance approved and properly noticed legislative activity to

---

[11] *Boudreaux v. Louisiana State Bar Ass'n*, 3 F.4th 748, 756 (5th Cir. 2021).
[12] ROA.1045 (District Court).
[13] ROA.495.

"issues involving practice and procedure, the judicial system, access to the courts, the compensation of judges or lawyers, or the legal profession, and to responding to any requests for information received from the legislature").

At its January 2022 meeting, the House of Delegates approved resolutions to (1) rescind all existing legislative policy positions;[14] (2) revise the LSBA's by-laws "to more accurately reflect current operating practices and remove outdated and obsolete provisions that are no longer effective";[15] and (3) recognize that the LSBA is bound by Rule XVIII, § 6,[16] and suspend "any [LSBA] activity not within [the Rule's] scope, including but not limited to any action with respect to legislative policy provisions previously adopted by the House of Delegates (which provisions are now obsolete and no longer effective under the text of the Rule)."[17] The LSBA no longer has a lobbyist,[18] and it has not engaged in any legislative advocacy since *McDonald*.[19]

After the parties engaged in discovery, including the production of thousands of pages of documents and numerous depositions, the district court conducted a

---

[14] ROA.2339, Exh. 55 (Bar Governance Committee Resolution Proposing to Rescind Legislative Policy Positions).
[15] ROA.2330, Exh. 54 (Bar Governance Committee Resolution Proposing Amendments to the By-Laws to the House of Delegates).
[16] ROA.2329, Exh. 53 (BOG Minutes and Resolution).
[17] ROA.2327, Exh. 53 (BOG Minutes and Resolution).
[18] ROA.1046 (District Court); ROA.2525-30, Exh. 73 (Budget Expenditure Update).
[19] ROA.1046 (District Court); ROA.1205-06, Testimony of H. Minor Pipes ("Pipes"); ROA.1243 (Kutcher).

bench trial. In its Findings of Fact and Conclusions of Law, the district court held that (1) *McDonald* forecloses the Plaintiff's claim that *Janus* applies to integrated bars; (2) the Plaintiff's challenges to the LSBA's past legislative activities are moot;[20] (3) the Plaintiff's challenges to the LSBA's emails and Twitter posts fail on the merits because this speech was germane, and, in the alternative, it does not satisfy *Lathrop*'s "major activity" test;[21] and (4) the LSBA's *Hudson* procedures provide an adequate additional safeguard.[22]

## SUMMARY OF THE ARGUMENT

This case is "one of several 'bar wars' lawsuits across the country." *See Boudreaux v. Louisiana State Bar Ass'n*, 3 F.4th 748, 751 (5th Cir. 2021). The Plaintiff's remaining claims, however, have virtually nothing in common with the other lawsuits. For example, other bars have engaged in significant and controversial political and ideological speech, including lobbying to amend the state constitutional definition of marriage[23] and accusing President Trump of catering to a "white nationalist movement."[24] The Plaintiff's remaining claims involve only a few instances of benign, nonideological conduct, such as Twitter messages promoting

---

[20] ROA.1054 (District Court).
[21] ROA.1061; ROA.1063 (District Court).
[22] ROA.1068-69 (District Court).
[23] *McDonald*, 4 F.4th at 248.
[24] *Crowe v. Oregon State Bar*, 989 F.3d 714, 722 (9th Cir. 2021).

6

lawyer mental health and an email advising lawyers that they can volunteer to participate in a Secret Santa program if they wish to do so.

Although Plaintiff filed this lawsuit to challenge legislative positions taken by the Legislation Committee and legislative policies adopted by the House of Delegates, that challenge is moot. Post-*McDonald*, the LSBA terminated its Legislation Committee and rescinded the challenged policies. Thus, the sole remaining issue before the Court is the Twitter messages and emails that even the Plaintiff conceded are "anodyne."[25]

The Plaintiff contends that mandatory bar membership is unconstitutional regardless of whether the bar engages in non-germane speech. In the alternative, he contends that any speech by the bar, even a single uncontroversial Twitter message, can lead to a "philosophical injury" that renders the entire bar unconstitutional. ROA.1093. This view is at odds with decisions of this Court and the U.S. Supreme Court holding that mandatory bar membership and dues are constitutional if the bar association engages in germane activity and provides *Hudson* procedures as an additional safeguard. The district court's judgment should be affirmed.

## STANDARD OF REVIEW

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo." *Luwisch v.*

---

[25] ROA.1129.

*American Marine Corp.*, 956 F.3d 320, 326 (5th Cir. 2020) (quoting *Barto v. Shore Constr., LLC*, 801 F.3d 465, 471 (5th Cir. 2015)). "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." FED. R. CIV. P. 52(a)(6).[26]

## **ARGUMENT**

### I.  **Introduction.**

The Louisiana Supreme Court and the LSBA work together to regulate the practice of law and improve the quality of legal services. As the Louisiana Supreme Court's Administrator explained, the Court "designates a lot of its responsibility to the LSBA, and really could not fulfill all of its responsibilities to regulate the practice of law without the LSBA."[27]

After *McDonald*, the Court and the LSBA took immediate action to ensure that LSBA activities remain comfortably within the constitutional limits identified by this Court. The Louisiana Supreme Court enacted Rule XVIII, Section 6, which directs that the LSBA's purpose is "to promote and assist the regulation of the practice of law, improve the quality of legal services, advance the science of

---

[26] Mr. Boudreaux's claim that "the district court did not identify any [factual findings] in its Findings of Fact and Conclusions of Law" is incorrect. Appellant's Br. at 17. The 33-page opinion is rife with factual determinations, none of which is challenged by Mr. Boudreaux on appeal.

[27] ROA.1270, Testimony of Sandra Vujnovich ("Vujnovich").

jurisprudence, promote the administration of justice, uphold the honor of the Courts and of the profession of law including Louisiana's civil law system, and, generally, to promote the welfare of the profession in the State."[28] This Rule also shifts responsibility for legislative policy and positions from the now-dissolved Legislation Committee and House of Delegates to the Board of Governors. Consistent with the Rule, the LSBA formally eliminated its Legislation Committee and rescinded all past legislative policies at its January 2022 annual meeting. These significant changes rendered the focal point of the Complaint—i.e., the challenges to the Legislation Committee and the legislative policies—moot.

The evidence at trial confirmed that the LSBA's present activities are germane to regulating the practice of law and improving the quality of legal services. Given the magnitude of the record, the district court ultimately noted that it would not exhaustively catalog the LSBA's "many functions."[29] Similarly here, the Defendants will provide only an overview of the LSBA's post-*McDonald* activities. This overview simultaneously confirms the germaneness of those activities and highlights the *de minimis* nature of the Plaintiff's remaining challenges, which pertain to a handful of Twitter messages and email notices relative to topics such as lawyer wellness and volunteer opportunities.

---

[28] ROA.1041-1042 (District Court).
[29] ROA.1042 (District Court).

9

## II.    Background

### A. The LSBA works with the Louisiana Supreme Court to regulate the practice of law and improve the quality of legal services.

The Louisiana Supreme Court regulates and improves the practice of law in Louisiana through both a regulatory agency, the Louisiana Attorney Disciplinary Board ("LADB"), and the LSBA.[30] Both assist the Louisiana Supreme Court in complementary ways.

The LADB is a statewide agency that administers Louisiana's lawyer discipline and disability system by investigating complaints of attorney misconduct and making discipline recommendations to the Louisiana Supreme Court.[31] Thus, the LADB typically executes the last step in the regulatory process.[32] Consistent with Louisiana Supreme Court directives, the LSBA contributes to lawyer regulation through a variety of other significant functions and tasks. For example:

1.  Louisiana Rule of Professional Conduct 7.7 delegates the advertising registration and review process to the LSBA's Rules of Professional Conduct Committee. The Committee issues advisory opinions on advertising,

---

[30] ROA.1088 (Boudreaux) ("[T]he LSBA, the Bar Association would refer to the State Disciplinary Board, and, eventually, the State Supreme Court has the regulatory authority over the lawyers.").

[31] ROA.809; ROA.1043 (District Court); ROA.1088 (Boudreaux).

[32] ROA.1279 ("And so even though [Rule 19] sets out the total scheme for attorney discipline . . . [i]t also provides for the possibility of diversion, and it's the Bar Association that has been given the responsibility by the court to handle the Diversion.").

maintains a searchable database of advertisements, and has a responsibility to refer non-compliant ads to disciplinary authorities.[33]

2. Rule 30 assigns the LSBA the responsibility of administering mandatory continuing legal education ("MCLE").[34]

3. The Board of Legal Specialization regulates and administers all matters pertaining to certified areas of specialization within the practice.[35]

4. A standing committee on the Rules of Professional Conduct monitors developments in legal ethics, reviews ethics issues the Louisiana Supreme Court refers to it, and supervises an Ethics Advisory Service that publishes advisory opinions in response to lawyer inquiries.[36]

5. The Court and the LSBA maintain an eligibility list of lawyers to practice law. The LSBA keeps track of approximately 23,000 attorneys, including their official contact information, dues payments, and satisfaction of CLE requirements. The Supreme Court and the LSBA issue Certificates of Good Standing.[37]

6. The Louisiana Supreme Court and LSBA jointly participate in the Access to Justice Commission established by the Court in 2015, which facilitates the provision of legal services to Louisiana citizens who require assistance with Access to Justice.[38]

7. The Practice Assistance and Improvement Program, which includes the Attorney-Client Assistance Program and Diversion Program coordinated by the LSBA's Practice Assistance Counsel, are "alternatives to discipline," part

---

[33] ROA.1042 (District Court); ROA.1270-1271. (Vujnovich),

[34] ROA.1042 (District Court); ROA.1271-1272 (Vujnovich).

[35] ROA.1042 (District Court); ROA.1272-1274 (Vujnovich).

[36] ROA.1042 (District Court); ROA.1275 (Vujnovich).

[37] ROA.1275 (Vujnovich).

[38] ROA.1042-1043 (District Court); ROA.1275-1277 (Vujnovich).

of the disciplinary diversion process, and are recognized within the Louisiana Supreme Court Rules on Discipline.[39]

8.  The LSBA also implements the Transition into Practice Program, allowing more experienced attorneys to share their knowledge with beginning lawyers. The Louisiana Supreme Court expressly relied on that program in 2020 when the Bar Exam was impacted by the COVID-19 pandemic.[40]

9.  The LSBA also assists the Louisiana Supreme Court with managing and regulating the practice of law in the aftermath of disasters. The two have worked together in response to hurricanes, flooding, and the pandemic.[41]

Louisiana attorneys are required to pay a disciplinary fee assessment to support the LADB and pay annual dues to the LSBA to support these functions. Louisiana attorneys are not required to participate in any LSBA activities or otherwise associate with the LSBA beyond the payment of dues.[42]

---

[39] ROA.1252, Testimony of Loretta Larsen ("Larsen"); ROA.1277 (Vujnovich); ROA.1290-1291, Testimony of Darrel Papillion ("Papillion") ("The State Bar Association administers the Client Assistance Fund which is a program that is different from say, professional negligence, in that this program helps compensate victims of misconduct of lawyers, bad acts that lead to client losses, theft.").

[40] ROA.1042 (District Court); ROA.1257-1258 (Larsen).

[41] ROA.1282-1283 (Vujnovich); ROA.1288 (Papillion) (In the aftermath of "catastrophic flooding" in August of 2016, there were "many, many lawyers, staff courthouses, where we could not deliver legal services, and it was essential for the LSBA to work with local courts, to work with the Supreme Court. We worked with all three U.S. District Courts in our state to help provide information to lawyers, to the public and to do the best that we could in a very difficult and challenging time. . . . We [also] provided some assistance and worked in coordination with the office of the governor with respect to proclamations and emergency orders during that time as well.").

[42] ROA.809. (It is uncontested that the "LSBA has not required Mr. Boudreaux to participate in any of its activities" and "[t]o his best recollection, Mr. Boudreaux has not participated in any LSBA activities apart from the payment of his mandatory dues."); ROA.1041 (District Court) ("The LSBA does not require its members to participate in any of its activities.").

**B. Other LSBA activities independently regulate the practice of law and improve the quality of legal services.**

The LSBA also provides committees and sections based on substantive areas of law; a Lawyer Dispute Resolution Program; the hard-copy and online *Louisiana Bar Journal*; an online newsletter "Bar Briefs"; live, remote, and pre-recorded CLE programming; funding for the Judges and Lawyers Assistance Program ("JLAP"), which is a comprehensive mental health and wellness assistance program; a member insurance program; specialized directories; mechanisms to identify and eliminate barriers to diversity in the legal profession; and support for the Louisiana Center for Law and Civic Education, which brings lawyers, judges, and educators together to present on topics in the areas of civics or law-related instruction.[43]

**C. The LSBA's post-*McDonald* changes ensure constitutional compliance.**

The swift actions by the Louisiana Supreme Court and the LSBA leadership in the weeks following *McDonald* confirm the LSBA's commitment to compliance. On July 8, 2021, within days of this Court's opinion in *McDonald*, the LSBA Board of Governors, using the emergency authority granted to it in its By-laws, voted to

---

[43] ROA.1252-1256 (Larsen).

suspend the then-existing Legislation Committee of the LSBA and all legislative activities until the House of Delegates convened for its January 2022 meeting.[44]

The Louisiana Supreme Court then took further action that effectively ended the legislative practices challenged by Mr. Boudreaux. The Louisiana Supreme Court adopted Rule XVIII, § 6, which codifies the constitutional germaneness standard and shifts responsibility for legislative policy and positions from the Legislation Committee and House of Delegates to the Board of Governors. Accordingly, the House of Delegates and its Legislation Committee are no longer responsible for the LSBA's legislative policy positions and advocacy, if any. Instead, the Board of Governors is the sole LSBA entity that can perform such functions, and its activities are limited by Supreme Court Rule to constitutionally germane topics such as those identified as appropriate in *McDonald*. Plainly, the LSBA—an organization consisting of attorneys—intends to comply with the Louisiana Supreme Court's directives. Lest there be any doubt, however, the Court's Judicial Administrator testified that there never was an instance she could recall "where the LSBA did not act in accordance with the wishes of the Louisiana Supreme Court relating to the regulation of the practice or improving the quality of legal services."[45]

---

[44] ROA.1226 (Kutcher) ("[W]e acted very quickly. I mean, understand this opinion came out on a Friday afternoon, July 4th weekend, and by what, July 8th, the Legislation Committee was suspended. . . . [I]t was an easy decision based on *McDonald*.").

[45] ROA.1267. (Vujnovich).

After the Court implemented Rule XVIII § 6, the LSBA's leadership followed the Court's directive by amending By-Laws, rescinding the former House of Delegates legislative policies, and eliminating the Legislation Committee. Finally, to ensure constitutional compliance post-*McDonald*, the Bar has increased the visibility of its objection procedures and disclaimers.[46] The LSBA has not engaged in any legislative advocacy since *McDonald*.

### III.    The district court correctly determined that *McDonald* forecloses Mr. Boudreaux's reliance on *Janus*.

In *Janus v. AFSCME*, 138 S. Ct. 2448 (2018), the Supreme Court held that public-sector unions cannot deduct agency fees from non-members' wages even if *Hudson* procedures are available. Thus, *Janus* requires "opt-in"[47] membership in this context. *McDonald*, however, correctly held that the opt-in rule from *Janus* does not apply to mandatory bar associations. Under *McDonald*, integrated bar associations are constitutional if they engage in germane activity and provide adequate *Hudson* procedures to address objections to any isolated instances of arguably nongermane

---

[46] ROA.1261 (Larsen) ("There's information about the fees and there's also a notice on how to object to the use of the Bar dues, should someone choose to do that. . . . We are publishing [the notice of *Hudson* procedures] in a number of places now. It's always been on our website, our governing documents, but we have stepped up the publication of these notices in the wake of *McDonald*.").

[47] Mr. Boudreaux's repeated statement in his appellate brief that the LSBA has shifted to an "opt-in" membership or dues system is incorrect. That phrase was never used at trial or in the district court opinion to describe the LSBA's procedures, and, indeed, the LSBA has "opt-out" procedures consistent with the guidance from *McDonald, Keller,* and *Lathrop.*

activity. *See*, e.g.*, McDonald v. Longley*, 4 F.4th 229, 253 (5th Cir. 2021) ("The plaintiffs are . . . incorrect that, at least under current law, opt-in procedures are required.").

On appeal, Plaintiff continues to press a *Janus*-based challenge, which he admits is "not dependent upon his agreement or disagreement with bar policy or conduct or whether the conduct is germane or nongermane to the state's interest in regulating lawyers."[48] The district court correctly dismissed Plaintiff's *Janus*-based claim outright based on *McDonald*,[49] and the claim need not long delay this Court.

The Plaintiff also, however, incorporates principles from *Janus* into the discussion of his other claims. In doing so, the Plaintiff erroneously assumes that *McDonald* tacitly adopted principles from *Janus*, notwithstanding the Court's express statement to the contrary.

The Plaintiff reveals the genesis of his mistake in the opening statements of his Summary of Argument:

> When bar associations act, "membership is part of the message." *McDonald*, 4 F.4th at 245. "If a member disagrees with that 'conception of the good life or controversial ideology,' then compelling his or her membership infringes on the freedom of association. *Id.* (citing *Janus v. AFSCME*, 138 S. Ct. 2448, 2463 (2018)) [sic].[50]

---

[48] Appellant's Br. at 15.

[49] ROA.1057 (District Court).

[50] Appellant's Br. at 15.

Contrary to Plaintiff's recitation, however, *McDonald* did not refer to or quote *Janus* for this point to define a free association claim. Instead, *McDonald* quoted a book chapter written by Stuart White and published in 1998.[51] The mistake in the Appellant's brief appears to stem from a misunderstanding relative to the repeated use of an "id." citation.

This simple but significant error as to the relationship between *McDonald* and *Janus* permeates the Appellant's Brief, including even when *Janus* is not cited. For example, Plaintiff repeatedly refers to union cases to identify a constitutional impingement that can occur when a mandatory association engages in non-germane speech.[52] Plaintiff fails to recognize, however, that the union cases[53] on which he relies do not support his position that any impingement of the First Amendment renders a bar association unconstitutional such that membership and dues should be "opt-in." Plaintiff needs *Janus* to support that conclusion, but *McDonald* forecloses Plaintiff's reliance on *Janus* in his mandatory bar challenge.

---

[51] The White chapter contemplates that mandatory associations can exist and engage in expressive conduct without violating the First Amendment. *See* Stuart White, *Trade Unionism in a Liberal State*, *in* Freedom of Ass'n at 330-38 (Amy Guttman ed. 1998).

[52] E.g., Appellant's Br. at 25.

[53] *See, e.g.*, Appellant's Br. at 11 (citing *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 311 (2012)).

**IV.  The legislative challenges are moot; alternatively, they are untimely and the Plaintiff did not show the requisite injury.**

   **A.  The District Court correctly concluded the legislative challenges are moot.**

*McDonald* held that, subject to certain important but limited exceptions, "advocating changes to a state's substantive law is non-germane to the purposes identified in *Keller*." *McDonald v. Longley*, 4 F.4th at 247. The LSBA's structure and limits have changed to ensure compliance with that ruling. More importantly, however, the LSBA has not engaged in any lobbying post-*McDonald* such that the district court correctly determined that the Plaintiff's claims are moot.

"[A] case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (some internal quotation marks omitted). The Complaint identified two categories of allegedly non-germane legislative speech: Legislation Committee positions on specific proposals and the prior House of Delegates' general policies on legislation ("HOD Policies"). The Legislation Committee no longer exists, and the prior HOD Policies have been rescinded.[54] The District Court found the evidence presented by the LSBA credible that the past legislative conduct would not recur, specifically finding "the testimony of LSBA officials to be genuine and

---

[54] ROA.1045, 1054 (District Court).

credible with respect to the LSBA's intention to comply with *McDonald*.[55] Thus, the District Court correctly held that "Plaintiff's claim is moot insofar as he challenges the LSBA's former legislative positions and now-rescinded policies of the House of Delegates, which occurred in the past and are not ongoing."[56]

The Plaintiff attempts to skirt this issue by arguing that the LSBA's past legislative conduct, combined with its failure to "renounce" that conduct, creates a risk of "future nongermane legislative activities."[57] But this type of "conjectural or hypothetical speculation" about future events is no substitute for a live case or controversy. *See Nike*, 568 U.S. at 97.

---

[55] An appellate court may only "upset the district court's findings of fact" if it is "left with the definite and firm conviction that a mistake has been committed." *Luwisch*, 956 F.3d at 326 (quotations omitted). "[E]ven greater deference to the trial court's findings" is required "when they are based on determinations of credibility." *Id.* (quotations omitted). Accordingly, there is a "strong presumption that the court's findings must be sustained even though this court might have weighed the evidence differently." *Id.* (quotations omitted). The "trial judge's credibility determinations are due this extra deference because only [he] can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Estate of Lisle v. Comm'r*, 541 F.3d 595, 601 (5th Cir. 2008) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 565, 575 (1985)).
[56] ROA.1054 (District Court) (citing Plaintiff's admission "that these policies 'are no longer in effect'").
[57] Appellant's Br. at 20.

Further, mootness has no renunciation requirement.[58] Thus, even when "the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit," the case is moot if the dispute "is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Id.* at 91 (quotation omitted). Here, there is no entity or statement remaining for the LSBA to renounce. More important, there is no remaining legislative activity that this Court could enjoin or declare unconstitutional.

Finally, the Plaintiff's creative argument that a bar association's past conduct creates a perpetual free association claim fails under *McDonald*. *McDonald* held that certain speech of the Texas bar failed the germaneness test *and* that the Texas bar could remain integrated if the bar simply stopped engaging in that speech. *McDonald*, 4 F.4th at 253 n.41 ("[T]he plaintiffs *can* be compelled to join the Bar if it ceases Its non-germane activities . . . .") (emphasis in original).

Plaintiff of course can file a new lawsuit in the implausible event that, at some future date, the LSBA were to disregard *McDonald,* Louisiana Supreme Court Rule XVIII, and its own governing documents and engage in nongermane legislative

---

[58] The prior legislative positions cited in the Appellant's brief generally focused on immunity provisions. The evidence at trial established that the LSBA does not intend to take similar positions in the future. ROA.1233-34. ("I can't dispute that *McDonald*, you know, changed things. I mean, it did, and it clarified where we are. And I understand the new rules and I'm living by the new rules. I think I would be pushing the envelope too—too far to say we're going to take a position on immunities now.").

activity. With respect to the legislative activity at issue in the Complaint, however, "this case has lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract questions of law." *See Princeton Univ. v. Schmid*, 455 U.S. 100, 103 (1982) (quotations omitted).

### B. In the alternative, the District Court should be affirmed because the legislative challenges are untimely and have not resulted in a cognizable injury.

The parties stipulated that the criticized legislative activity was limited to 25 prior positions on proposed legislation and now-rescinded HOD Policies.[59] The vast majority of this activity occurred prior to 2018 such that challenges are time-barred under 42 U.S.C. § 1983's one-year statute of limitations.[60] The District Court properly dismissed these challenges based on mootness and, thus, did not reach this issue. Nonetheless, other courts have consistently recognized that challenges to the constitutionality of a bar association, like any other claim under § 1983, must be timely. *Schell v. Chief Just. & Justs. of Oklahoma Supreme Court*, 11 F.4th 1178, 1191 (10th Cir. 2021) ("Where Mr. Schell initiated this action on March 26, 2019,

---

[59] *See* ROA.870-71.

[60] "Section 1983 claims pending in federal courts in Louisiana are subject to a one year statute of limitations period." *Gordon v. James*, No. CV 16-16540, 2017 WL 4311125, at *6 (E.D. La. Sept. 26, 2017) (Feldman, J.). "[T]he statute of limitations begins to run from the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured." *Helton v. Clements*, 832 F.2d 332, 335 (5th Cir. 1987).

only allegations occurring on or after March 26, 2017, fall within [Oklahoma's two-year] statute-of-limitations period."). This provides an alternative ground on which to affirm the district court.

Further, insofar as he pointed out a few instances of recent speech, Plaintiff failed to demonstrate any personal disagreement with the recent speech he identified. This Court previously held that at the Rule 12(b)(6) stage Plaintiff need not allege specific personal disagreement to establish standing.[61] Even if personal disagreement is not required for standing to bring a complaint, it is required to establish an injury on the merits. *See, e.g.*, *United States v. United Foods, Inc.*, 533 U.S. 405, 410-11 (2001) ("First Amendment concerns apply here because of the requirement that producers subsidize speech with which they disagree.").[62] Plaintiff's putative "philosophical injury," which reflects his "annoyance" with "anodyne" bar speech falls short of this standard.[63]

---

[61] The LSBA respectfully preserves its argument that personal disagreement is a necessary element of standing, which Mr. Boudreaux failed to prove at trial.

[62] The record also confirms that the LSBA provided *Hudson* notice with respect to each challenged legislative position. *See infra* Section VI. Thus, even if the legislative claims were timely and based on personal disagreement, the District Court could be affirmed on this alternative ground.

[63] ROA.1129, 1092-93.

**V.    The district court correctly held that the LSBA's post-*McDonald* conduct is germane.**

The Plaintiff stipulated in the pretrial order that his lawsuit criticized only certain conduct identified in his Complaint, Motion for Preliminary Injunction, and discovery responses.[64] Of this stipulated conduct, only seventeen email and Twitter messages remain post-*McDonald*.[65] The district court correctly held that the evidence at trial established the germaneness of these items.

**A.    Lawyer wellness is germane.**

The Plaintiff criticized a short list of LSBA tweets addressing issues of physical and mental health. Defendants offered testimony that these tweets referred to and were intended to promote JLAP and "Wellness Wednesday" programming,[66] which encourages attorneys to remain mindful of wellness issues and offers periodic optional CLEs directed to attorney wellness issues.[67] The district court noted that the

---

[64] ROA.811.

[65] *See* ROA.2271-72, Exh. 45 (summarizing the remaining Twitter and email messages criticized by the Plaintiff).

[66] *See, e.g.*, ROA.1861 (May 2020 Twitter message) ("JLAP Wellness Tip [:] Fresh air and sunlight can have a positive effect on mood. . . . A #Wellness Wednesday tip straight from the Judges and Lawyers Assistance Program! It's important to intentionally protect your emotional well-being during challenging times. Visit JLAP's website for wellness tips and links to useful information to support your mental health: http://louisianajlap.com/covid-19.").

[67] ROA.1181 & 1191 (Pipes) ("I think, again, we live in a high stress world. There are more suicides among lawyers than there are in the general public. There's more

Louisiana Rules of Professional Conduct provide in Rule 1.16 that "a lawyer shall not represent a client . . . if . . . the lawyer's physical or mental condition materially impairs the lawyer's ability to represent the client."[68] *See McDonald v. Longley*, 4 F.4th at 249-50 ("To take a non-controversial example, the Bar's advocating a particular ethical rule is germane no matter how strenuously an attorney might disagree with its propriety."). The district court further heard testimony that addressed the increased rates of mental health issues and alcoholism in the legal profession, as compared to the general public.[69] The district correctly concluded the LSBA speech on maintaining lawyer wellness was germane.[70]

## B. Notices of lawyer-centric activities and volunteer opportunities are germane.

Plaintiff also challenged notices to attorneys of opportunities to volunteer with or contribute to holiday charitable drives—namely, a Halloween costume drive and the Secret Santa program. These notices are germane because the Code of

---

alcoholism. There [are] more mental breakdowns. . . . I'm leaving today to go to a funeral for a lawyer who killed himself. It's not a good situation, but anything we can do to help, I think we owe it to the lawyers, to the profession, and to the community to try.").

[68] ROA.1062 (District Court).

[69] ROA.1061 (District Court).

[70] ROA.1061 (District Court).

Professionalism confirms that lawyers should "work to protect and improve the image of the legal profession in the eyes of the public."[71]

And the district court correctly found the LSBA's communications providing notice of the "69th Annual Red Mass"[72] hosted and funded by the St. Thomas More Catholic Lawyers Association were germane, because the LSBA was "alerting its members to an optional event that fosters community in the legal profession."[73]

The record confirmed that these notices of optional charitable and fellowship activities organized by, through, or for lawyers are germane to the LSBA's purpose and the State of Louisiana's legitimate interest in improving the image of the legal profession in the eyes of the public.[74] Further, the fact that the notices merely provide "information for attorneys interested in such matters to connect with related organizations" confirms that the speech is permissible. *See McDonald*, 4 F.4th at 251.

---

[71] *See* Louisiana Code of Professionalism (available at https://www.lsba.org/Members/LegalLibrary.aspx).

[72] The Red Mass dates back centuries to Rome, Paris, and London, and it is celebrated in multiple states, including Louisiana. ROA.2283 (press release from Louisiana Supreme Court).

[73] ROA.1063 (District Court).

[74] *See also* White, *supra* n. 51, at 336 (concluding that a trade union is not engaging in impermissible expressive conduct if it acts "in a manner that is informed by broad notions of justice and democratic citizenship that are part of the shared political culture of a liberal society, but without committing to any specific view of the good life or controversial ideology of the good society").

### C. Technological competency and public safety announcements are germane.

Finally, the district court correctly held that tweets regarding technology usage and security practices are germane "because they promote attorneys' technological competency and responsible usage of technology."[75] *See also* Louisiana Code of Professionalism ("I will use technology, including social media, responsibly."); Louisiana Rules of Professional Conduct, Rule 1.1 (competence), Rule 1.6 (confidentiality).

And as for the LSBA's tweet reminding members to check the batteries in their smoke and carbon monoxide detectors in the wake of Hurricane Ida, such health and safety reminders promote lawyer's physical and mental health consistent with Louisiana Rule of Professional Conduct 1.16 ("[A] lawyer shall not represent a client . . . if . . . the lawyer's physical or mental condition materially impairs the lawyer's ability to represent the client").[76] As past-bar president Minor Pipes testified, "lawyers sometimes get caught up in the high stress and high pace of our practice, and we forget those simple things; so reminding them, I think is important."[77] Moreover, the LSBA's Communications Director described why maintaining an

---

[75] ROA.1064 (District Court).

[76] ROA.1062 (District Court).

[77] ROA.1183. Moreover, in addition to promoting safety for lawyers, their staff, and clients, the presence of smoke and carbon monoxide detectors supports a law office's ability to safeguard its records. *See* ROA.1064 (District Court).

effective social media presence that will reach attorneys in the event of, e.g., natural disasters, requires ongoing engagement through routine communication.[78] Even assuming that isolated instances of nonideological and nonpolitical speech could impinge on the First Amendment rights of attorneys,[79] the regular communications to members on related topics of interest to lawyers in this case are permissible as a means to maintain engagement to support the state's interest in maintaining effective emergency communication.

### D. Alternatively, any non-germane activity was *de minimis*, did not materially impair any constitutional rights, and did not meet *Lathrop*'s major activity threshold requirement.

The district court correctly applied *Lathrop* by concluding, in the alternative, that the seventeen Tweets and emails discussed above were not a major activity of the bar and, thus, did not create an actionable infringement.[80]

---

[78] ROA.1215-16 (Ponder) ("Well, I would say for the social media aspect, we are also looking at lawyer engagement. We want our members to view our site. If we didn't post anything, but when the Court closed because of Ida; well, then we're kind of dead in the water, and no one even knows we're out there. So we want to engage our members, have them come to us, so when there are major, you know, natural disasters, they're already in tune to what we're posting, and they're engaged in what, you know, to what we put out to our members.").

[79] The Complaint, *Boudreaux I,* and *McDonald* all focus on political or ideological speech. Similarly, the plaintiff in *Crowe v. Oregon State Bar*, 989 F.3d 714 (9th Cir. 2021), focused on alleged "political speech nongermane to the Bar's role in regulating the legal profession" based on statements "against white nationalism." *Id.* at 724. Nothing in *McDonald* suggests that the same level of scrutiny extends to nonpolitical and nonideological speech, and plainly statements in that category do not present the same level of constitutional concern.

[80] ROA.1060-1061 (District Court).

The Plaintiff's insistence that *Lathrop* does not impose a major activity standard is incorrect. A majority of the justices in *Lathrop* held that the Wisconsin Bar did not violate freedom of association despite the fact that it engaged in *some conduct* that did not reasonably serve the purposes of regulating the bar or improving the quality of legal services.[81]

The *Lathrop* Court found that legislative activity was "not the major activity of the State Bar" in Wisconsin. 367 U.S. 839.

> Both in purport and in practice the bulk of State Bar activities serve the function, or at least so Wisconsin might reasonably believe, of elevating the educational and ethical standards of the Bar to the end of improving the quality of the legal service available to the people of the State, without any reference to the political process. It cannot be denied that this is a legitimate end of state policy. We think that the Supreme Court of Wisconsin, in order to further the State's legitimate interests in raising the quality of professional services, may constitutionally require that the costs of improving the profession in this fashion should be shared by the subjects and beneficiaries of the regulatory program, the lawyers, even though the organization created to attain the objective also engages in some legislative activity. Given the character of the integrated bar shown on this record, in the light of the limitation of the membership requirement to the compulsory payment of reasonable annual dues, we are unable to find any impingement upon protected rights of association.

*Id.* at 843. (footnote omitted).

---

[81] While the description of the bar's activities comes from *Lathrop*'s plurality opinion, a majority of the justices upheld the constitutionality of the bar. *See Lathrop*, 367 U.S. at 848, 865 (Harlan, J. and Frankfurter, J., concurring in the judgment; and Whittaker, J. concurring in the result).

In *McDonald*, this Court affirmed *Lathrop*'s precedential value, *even* while acknowledging that the Wisconsin bar's lobbying on issues of "curtesy and dower," "extending personal jurisdiction over nonresidents," and "federal tax liens" was not germane. 4 F.4th at 248, n.23. Thus, *McDonald* confirms that under a proper reading of *Lathrop*, there is no associational claim against a mandatory bar whose only membership requirement is the compulsory payment of reasonable annual dues when the Bar's major activities serve legitimate State functions.

Adhering to this precedent, the district court agreed that the constitutional viability of a mandatory bar association should not be read to hinge on "a single non-germane tweet," and that the activities criticized in *McDonald* as non-germane were far more substantial than the handful of inoffensive communications criticized by the Plaintiff in this matter.[82]

Similarly, the Tenth Circuit has recognized that *Lathrop* requires some assessment of the relative amount of allegedly non-germane activity at issue: "A potential open issue is to what degree, in quantity, substance, or prominence, a bar association must engage in non-germane activities in order to support a freedom-of-association claim based on compelled bar membership." *Schell v. Chief Just. & Justs. of Oklahoma Supreme Ct.*, 11 F.4th 1178, 1195 n.11 (10th Cir. 2021) (citing *Lathrop v. Donohue*, 367 U.S. 820, 839, 843 (1961)). The handful of social media

---

[82] ROA.1060-61 (District Court).

posts standing alone cannot be considered a "major activity" of the LSBA and were characterized by the Appellant as merely "anodyne."[83] De minimis activities that may not be obviously germane standing alone (and taken out of context from a large communications strategy) do not create an associational injury when all of the bar's other activities serve legitimate state interests.

## VI.    The LSBA's *Hudson* safeguards are sufficient, as evidenced by Plaintiff's failure to identify any expenditure for which he lacked adequate notice.

In the alternative, insofar as this Court determines that some constitutional impingement has occurred, the LSBA's *Hudson* procedures provide an adequate remedy. This Court previously reviewed Plaintiff's *Hudson* claims under the Rule 12(b)(6) standard and concluded that Plaintiff had alleged a cognizable injury by alleging that he lacked sufficient information to identify non-germane expenditures. "The Constitution requires that bar members be able to challenge expenditures as non-germane, but Boudreaux allege[d that] he [was] unable to do so because of LSBA's deficient notice process." *Boudreaux v. Louisiana State Bar Ass'n*, 3 F.4th 748, 760 (5th Cir. 2021).

On remand, the parties engaged in extensive discovery, including relative to the LSBA's expenditures and activities. At trial, however, Plaintiff still did identify any expenditure that he would have challenged were it not for an alleged deficiency

---

[83] ROA.1129.

in the LSBA's procedures.[84] And, on appeal, Plaintiff's discussion of the *Hudson* issue avoids any citation to his own testimony. The omission is telling.

Plaintiff testified at trial that he received sufficient information from the LSBA relative to its activities but simply chose not to object because it was not that important to him. ROA.1101 (stating that "[i]t wasn't clear" to him what objecting "would accomplish" and that he did not want to "take the time out of [his] day and type and send a letter"). Thus, while he was able to establish standing at the Rule 12(b)(6) stage, he was unable to establish standing—or, alternatively, the requisite constitutional injury on the merits—at trial.

Unlike the Texas bar pre-*McDonald*,[85] the LSBA's procedures were designed to meet and exceed *Hudson*'s constitutional minimum requirements. And those procedures have become even more robust post-*McDonald*. Plaintiff does not challenge the district court's conclusions relative to the sufficiency of most of the LSBA's *Hudson* procedures. The district court concluded:

> The LSBA clearly complies with *Hudson*'s requirement to provide "a reasonably prompt opportunity to challenge [a disputed fee] before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." *Id.* at 253 (quoting *Hudson*, 475 U.S. at 310, 106 S.Ct. 1066). As set forth in greater detail above, once an objection is filed, the *pro rata* amount of the objecting

---

[84] The section of Mr. Boudreaux's brief devoted to his *Hudson* claim (Section IV) does not cite his testimony even once.

[85] *See McDonald*, 4 F.4th at 254 ("[W]hether a refund is available is left to the sole discretion of the Bar's Executive Director . . . In the event a refund is denied, the objecting attorney is out of luck.").

31

member's dues devoted to the challenged activity is promptly placed in escrow while the Board determines whether to grant a refund based on the objection. Within 60 days, the Board either provides a *pro rata* refund or refers the matter to arbitration. Historically, all timely objections have resulted in refunds.

ROA.1068-69 (district court) (footnotes omitted). Instead, Plaintiff challenges only the district court's conclusion that the LSBA provides adequate detail regarding its expenditures.[86]

Plaintiff frames his argument as whether the provision of a single LSBA preliminary budget document, coupled with "inquiry notice" (a phrase never used at trial), constitutes an adequate *Hudson* notice.[87] But the preliminary budget document is only one of the many methods by which the LSBA provides information to its members.

On an annual basis, the LSBA provides members with prospective information first through a draft proposed budget and again with retrospective information through audited financial statements.[88] Consistent with *McDonald*, this allows members to assess the approximate allocation of funds to different categories

---

[86] Appellant's Br. at 17, 33.

[87] Mr. Boudreaux confusingly refers to the LSBA's procedures as "opt-in"—a phrase typically associated with the procedure required by *Janus.* The evidence at trial was clear, however, that the LSBA continues to use a refund procedure consistent with *Keller* and *McDonald*. There was no evidence of an "opt-in" procedure, much less deficiencies in such a procedure.

[88] The District Court correctly recognized that "the LSBA 'need not provide [members] with an exhaustive and detailed list of all its expenditures.'" ROA.1071 (District Court) (quoting *Hudson*, 475 U.S. at 307 n.18 and adding bracketed term).

of expenses. Much more frequently, the LSBA alerts its members to its activities through the publication of the *Bar Journal*, the dissemination of *Bar Briefs*, and email announcements, each of which is delivered to members without further "inquiry" required. Members can object to LSBA expenditures based on the preliminary budget, the audited financial statements, the email alerts, the *Bar Briefs*, the *Bar Journal*, or any other notice that they receive. Thus, the LSBA's procedures far exceed the standard set forth in *McDonald* and *Hudson*, and the district court correctly entered judgment in LSBA's favor on this claim.

On appeal, it is unclear whether Plaintiff disputes that adequate *Hudson* procedures could remedy each *de minimis* constitutional violations he alleges. The district court indicated that *McDonald* could be read to suggest that *Hudson* procedures can cure free speech violations, but violations of freedom of association "cannot be cured by the availability of sufficient notice and opt-out procedures." ROA.1057 (District Court). After a careful and thoughtful analysis, the district court rejected this interpretation of *McDonald*, noting that its "practical effect will be that mandatory bar associations will eventually be rendered extinct." ROA.1061 (District Court).

The district court is correct: a litigant cannot evade the *Hudson* framework simply by reframing his or her free speech challenge as one based on association.

33

Moreover, *McDonald* strongly supports the conclusion that *Hudson* procedures are relevant to both speech and associational challenges.

As *McDonald* observes, "*Keller* noted that 'an integrated bar could certainly meet its *Abood* obligation by adopting the sort of procedures described in *Hudson*.'" 4 F.4th at 253 (quoting *Keller*, 496 U.S. at 17). *Abood*, however, is purely an association case. *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209, 225 (1977). Thus, an integrated bar can "certainly meet its [free association] obligation" through *Hudson* procedures. *See* 4 F.4th at 253. Moreover, *McDonald* correctly recognizes that "the right to freedom of association is part of the freedom of speech." *Id.* at 245. *Keller*'s holding that *Hudson* procedures provide a sufficient remedy for impingement on freedom of speech necessarily extends to any alleged impingement on freedom of association. To hold otherwise would mean that *Keller* was a dead letter the date it was decided, avoidable merely by labeling a claim as one based on association rather than speech.[89]

## VII.    In the alternative, the government speech doctrine applies.

If this Court or the U.S. Supreme Court were to reconsider or re-visit *Keller*, as the Plaintiff requests, *Keller*'s passing conclusion that bar association speech (at

---

[89] Further, *McDonald* must be understood in the context of Texas's procedures—which, the Fifth Circuit determined, were constitutionally inadequate. *McDonald* did not address a case like this one, where the bar has appropriate *Hudson* procedures that provide an additional layer of protection against any alleged constitutional violation.

least in California) is not protected government speech also should be revisited. The "government speech doctrine" provides that, in order to effectively govern, the government may take substantive positions and decide disputed issues despite citizen disagreement so long as it bases its actions on legitimate goals.[90] The Supreme Court held in *Keller* that the State Bar of California's speech, however, was not "government speech" because that bar was not created to participate in the general government of the State, but to provide specialized advice to the legal profession, more akin to a trade union.

The same is not true for the LSBA. The LSBA speech challenged in Plaintiff's lawsuit is properly considered "government speech" because the LSBA was authorized by legislation and remains subject to the supervision and direction of the Louisiana Supreme Court. As demonstrated by the passage of Rule XVIII § 6, the Louisiana Supreme Court can and does directly and constitutionally regulate the LSBA's speech and has cabined the LSBA's activities to those constitutionally germane to certain legitimate government purposes. The ultimate authority on LSBA speech, therefore, does not lie with its membership, but with the Court itself as the

---

[90] *See Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.").

plenary authority regulating the practice of law in Louisiana.[91] The Court's elected justices are ultimately answerable to the democratic process and are held politically accountable for activities they do and do not allow the LSBA to pursue.

The challenged LSBA speech also serves legitimate State goals insofar as it promotes principles found within the Rules of Professional Conduct and the Code of Professionalism as to wellness, technological competency, and volunteer opportunities to improve the reputation of the profession in the community. This speech fulfills the LSBA's regulatory role and is protected under the government speech doctrine. As the Supreme Court observed in *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009), "[a] government entity may exercise this same freedom to express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message."

*Keller*'s conclusion that the California bar's speech was not government speech should not automatically apply to all bar associations, but should be revisited based upon the degree of control the government exercises over the bar's speech in

---

[91] The Defendants further recognize that this Court held in *Boudreaux I* that the Tax Injunction Act does not apply to this lawsuit because the dues imposed on LSBA members are a regulatory fee, and not a tax. As demonstrated at trial, the LSBA is an important partner with the Louisiana Supreme Court in regulating the practice of law. The Defendants respectfully reserve the right to re-urge the argument that the record developed below supports application of the Tax Injunction Act to bar this lawsuit and LSBA dues should be considered a tax in the event this case is ever considered by this Court en banc or by the U.S. Supreme Court.

each state. In Louisiana, the LSBA's regulatory function and close and cooperative relationship with the Court, under its direct supervision and control, further confirms that the government speech doctrine should extend to the LSBA. Thus, the record supports that the Louisiana Supreme Court has full authority to and does control the boundaries and modalities of LSBA speech to such an extent that its speech should qualify as government speech.

## CONCLUSION

The Plaintiff failed to demonstrate at trial how membership in the LSBA unconstitutionally infringes his rights of freedom of speech or association or why its *Hudson* procedures are insufficient to protect his rights. The district court's judgment dismissing the Plaintiff's claims against the Louisiana Supreme Court, its Justices, and the LSBA should be affirmed.

Respectfully submitted,

*/s/ Richard C. Stanley*
Richard C. Stanley, 8487
Eva J. Dossier, 35753
Kathryn W. Munson, 35933
**STANLEY, REUTER, THORNTON,**
 **ALFORD, L.L.C.**
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone:   (504) 523-1580
Facsimile:    (504) 524-0069

*Counsel for Defendants-Appellees the Louisiana State Bar Association, Louisiana Supreme Court, Chief Justice Johnson, Justice Crichton, Justice Genovese, Justice Clark, Justice Hughes, and Justice Weimer*

## CERTIFICATE OF SERVICE

I certify that on January 12, 2023, the foregoing document was served, via the

Court's CM/ECF Document Filing System, on all counsel of record.

*/s/ Richard C. Stanley*
Richard C. Stanley, 8487
Eva J. Dossier, 35753
Kathryn W. Munson, 35933
**STANLEY, REUTER, THORNTON,
 ALFORD, L.L.C.**
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone:   (504) 523-1580
Facsimile:    (504) 524-0069

*Counsel for Defendants-Appellees the Louisiana
State Bar Association, Louisiana Supreme Court,
Chief Justice Johnson, Justice Crichton, Justice
Genovese, Justice Clark, Justice Hughes, and
Justice Weimer*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) this document contains 8,886 words.

2.     This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman size 14 font.

<div style="margin-left: 40%;">

*/s/ Richard C. Stanley*
Richard C. Stanley, 8487
Eva J. Dossier, 35753
Kathryn W. Munson, 35933
**STANLEY, REUTER, THORNTON,**
  **ALFORD, L.L.C.**
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone:   (504) 523-1580
Facsimile:    (504) 524-0069

*Counsel for Defendants-Appellees the Louisiana State Bar Association, Louisiana Supreme Court, Chief Justice Johnson, Justice Crichton, Justice Genovese, Justice Clark, Justice Hughes, and Justice Weimer*

</div>